McKART *v.* UNITED STATES.

No. 403.   Argued February 27, 1969.—Decided May 26, 1969.

*George C. Pontikes* argued the cause for petitioner. With him on the briefs was *Marshall Patner.*

*Francis X. Beytagh, Jr.,* argued the cause for the United States. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Wilson, Beatrice Rosenberg,* and *Leonard H. Dickstein.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Petitioner was indicted for willfully and knowingly failing to report for and submit to induction into the

Armed Forces of the United States.[1] At trial, petitioner's only defense was that he should have been exempt from military service because he was the "sole surviving son" of a family whose father had been killed in action while serving in the Armed Forces of the United States.[2] The District Court held that he could not raise that defense because he had failed to exhaust the administrative remedies provided by the Selective Service System. Accordingly, petitioner was convicted and sentenced to three years' imprisonment. The Court of Appeals affirmed, with one judge dissenting. *United States* v. *McKart,* 395 F. 2d 906 (C. A. 6th Cir. 1968). We granted certiorari. 393 U. S. 922 (1968).

## I.

The facts are not in dispute. Petitioner registered with his local Selective Service board shortly after his 18th birthday and thereafter completed his classification

[1] "Any . . . person . . . who in any manner shall knowingly fail or neglect or refuse to perform any duty required of him under or in the execution of this title . . . , or rules, regulations, or directions made pursuant to this title . . . shall, upon conviction in any district court of the United States of competent jurisdiction, be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment . . . ." Selective Service Act of 1948, § 12, 62 Stat. 622, as amended, now § 12 of the Military Selective Service Act of 1967 (see 81 Stat. 100, § 1 (a)), 50 U. S. C. App. § 462 (1964 ed., Supp. III).

[2] "Except during the period of a war or a national emergency declared by the Congress after the date of the enactment of the 1964 amendment to this subsection [July 7, 1964], where the father or one or more sons or daughters of a family were killed in action or died in line of duty while serving in the Armed Forces of the United States, or subsequently died as a result of injuries received or disease incurred during such service, the sole surviving son of such family shall not be inducted for service under the terms of this title . . . unless he volunteers for induction." Selective Service Act of 1948, § 6 (*o*), 62 Stat. 613, as amended, 50 U. S. C. App. § 456 (*o*).

questionnaire. On that form he indicated that he was "the sole surviving son of a family of which one or more sons or daughters were killed in action . . . while serving in the Armed Forces of the United States . . . ." On February 25, 1963, petitioner's local board placed him in Class I–A, available for military service; he made no attempt to appeal that classification.[3]

On March 23, 1964, he was ordered to report for a pre-induction physical, but failed to do so. He was declared a delinquent and ordered to report for induction on May 11, 1964. He failed to report, but instead wrote a letter to his local board indicating that his moral beliefs prevented him from cooperating with the Selective Service System. The local board replied by sending petitioner the form for claiming conscientious objector status. The board also referred to petitioner's indication in his original questionnaire that he was a sole surviving son and requested further information on that subject.

On May 20, 1964, petitioner returned the blank form, stating that he did not wish to be a conscientious objector. In response to the board's request for information about his claim to be a sole surviving son, petitioner indicated that his father had been killed in World War II. The local board, after consulting the State Director, again wrote petitioner requesting more information about his father. Petitioner supplied some of the information. The local board forwarded this information to the State

[3] A registrant has the right to appear before his local board to contest his classification or to present new information to the board. 32 CFR §§ 1624.1, 1624.2 (1969). The board then determines whether or not to reconsider the registrant's classification. 32 CFR §§ 1624.2 (c), (d) (1969). Following the local board's decision, the registrant has the right to appeal to the state appeal board. 32 CFR §§ 1624.2 (e), 1625.13 (1969). A further appeal may be taken by the registrant to the National Selective Service Appeal Board only if one or more members of the state appeal board dissent from the board's decision. 32 CFR § 1627.3 (1969).

Director, who requested the local board to reopen petitioner's classification.[4] The board canceled his induction order and reclassified him IV–A, the appropriate classification for a registrant exempted as a sole surviving son. Petitioner remained in that classification until February 14, 1966.

Early in 1966, the local board learned of the death of petitioner's mother. After checking with the State Director, the board returned petitioner to Class I–A. The board rested this decision on the theory that a IV–A classification became improper when petitioner's "family unit" ceased to exist on the death of his mother. Petitioner was ordered to report for a pre-induction physical. He failed to report and was declared a delinquent and ordered to report for induction. He again failed to report and, after further investigation, his criminal prosecution followed.[5]

## II.

We think it clear that petitioner was exempt from military service as a sole surviving son. The sole surviving son exemption originated in the Selective Service Act of 1948, c. 625, § 6 (o), 62 Stat. 613. As originally enacted, that section provided exemption for the sole surviving son only "[w]here one or more sons or daughters of a family were killed in action . . . while

---

[4] The Selective Service System Regulations require the local board to reopen a registrant's classification upon the written request of the State or National Director. 32 CFR § 1625.3 (a) (1969).

[5] After petitioner failed to report for induction the second time, the State Director confirmed that petitioner's father had been killed in action and then requested advice of the National Director. The latter replied that "inasmuch as there is no family, it is not believed that [petitioner] would qualify for sole surviving son status." This information was then communicated to the local board and the case referred to the local United States Attorney. Petitioner's indictment followed.

serving in the armed forces of the United States." In 1964, the section was amended to extend the exemption to sole surviving sons whose fathers were killed in action. 78 Stat. 296. The section now reads in relevant part as follows:

> "[W]here the father or one or more sons or daughters of a family were killed in action or died in line of duty while serving in the Armed Forces . . . the sole surviving son of such family shall not be inducted for service . . . ." 50 U. S. C. App. § 456 (o).

There is no question that petitioner was entitled to an exemption before the death of his mother. The issue is whether her death, and the end of the immediate "family unit," ended that exemption.

We have found no cases discussing this aspect of § 6 (o).[6] The applicable Selective Service System Regulation, 32 CFR § 1622.40 (a)(10) (1969), merely repeats the language of the statute. The System's administrative interpretations have not been uniform,[7] although in the present case the National Director took the position that "inasmuch as there is no family, it is not believed that [petitioner] would qualify for sole surviving son status." We must, therefore, decide what is essentially a question of first impression. Our examination of the language and legislative history of § 6 (o) indicates that the Selective Service System's interpretation fails to effectuate fully the purposes Congress had in mind in providing the exemption.

---

[6] Cf. *Pickens* v. *Cox*, 282 F. 2d 784 (C. A. 10th Cir. 1960).

[7] Shortly after the 1964 amendment, the Selective Service System took the position that a sole surviving son exemption would not be affected by any change in the status of the family, other than the birth of a full brother. Selective Service System Operations Bulletin No. 263 (August 14, 1964). That position was later rescinded and the System has issued no further instructions concerning § 6(o).

The language of the statute provides only three conditions, two explicit and one implicit, upon which the exemption should terminate. The registrant may volunteer for service, a national emergency or war may be declared, or, implicitly, the registrant may cease to be the sole surviving son by the birth of a brother. The section says nothing about the continuing existence of a family unit, even though other provisions of the Selective Service laws make similar conditions explicit in other contexts.[8]

The argument for conditioning the exemption upon the continued existence of a family unit is based not upon the language or structure of the statute but upon certain references in the legislative history. These comments indicate that one purpose of the exemption was to provide "solace and consolation" to the remaining family members by guaranteeing the presence of the sole surviving son. See S. Rep. No. 1119, 88th Cong., 2d Sess., 3 (1964); Hearings before Subcommittee No. 1 of the House Committee on Armed Services on H. R. 2664, 88th Cong., 1st Sess., 3442–3443 (1963). When there is no one left to comfort, it is argued, the sole surviving son may be drafted. However, our examination of the sparse legislative history discloses that Congress

---

[8] Section 6 (h) of the Military Selective Service Act of 1967, 81 Stat. 102, authorizes the President to provide for the deferment of "persons who have children, or wives and children, with whom they maintain a bona fide family relationship in their homes." Section 6 (h) of the Selective Service Act of 1948, 62 Stat. 611, was to the same general effect.

Had Congress wished to condition the exemption on the existence of a family unit, it would also seem logical for it to have defined that "family unit." For example, the trial in the present case disclosed that both of petitioner's maternal grandparents and his paternal grandmother were still living. Nothing in the statute indicates whether these relatives should be considered part of the "family."

had not one but several purposes in mind in providing the exemption, only some of which depend upon the existence of a family unit.

Perhaps chief among these other purposes was a desire to avoid extinguishing the male line of a family through the death in action of the only surviving son. See S. Rep. No. 1119, *supra;* Hearing before the Senate Committee on Armed Services on H. R. 2664, 88th Cong., 1st Sess., 30–31 (1963); 110 Cong. Rec. 15218 (1964) (remarks of Senator Keating). Other purposes mentioned were providing financial support for the remaining family members, fairness to the registrant who has lost his father in the service of his country, and the feeling that there is, under normal circumstances, a limit to the sacrifice that one family must make in the service of the country. See Hearing before the Senate Committee on Armed Services on H. R. 2664, *supra,* at 30–31; Hearings before Subcommittee No. 1 of the House Committee on Armed Services on H. R. 2664, *supra,* at 3442–3443; 109 Cong. Rec. 24889 (1963).

Perhaps the most that can be said in these circumstances is that Congress had multiple purposes in mind in providing an exemption for a sole surviving son. Depriving petitioner of an exemption might not frustrate one of these purposes, but it certainly would frustrate several of the others. Therefore, given the beneficent basis for § 6 (*o*), we cannot believe that Congress intended to make one factor, the existence of a "family unit," crucial. Accordingly, the death of petitioner's mother did not operate to deprive him of his right to be exempt from military service. The local board erred in classifying petitioner I–A and ordering him to report for induction.

III.

The Government maintains, however, that petitioner cannot raise the invalidity of his I–A classification and

subsequent induction order as a defense to a criminal prosecution for refusal to report for induction. According to the Government, petitioner's failure to appeal his reclassification after the death of his mother constitutes a failure to exhaust available administrative remedies and therefore should bar all judicial review. For the reasons set out below, we cannot agree.

The doctrine of exhaustion of administrative remedies is well established in the jurisprudence of administrative law. See generally 3 K. Davis, Administrative Law Treatise § 20.01 *et seq.* (1958 ed., 1965 Supp.); L. Jaffe, Judicial Control of Administrative Action 424–458 (1965). The doctrine provides "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41, 50–51 (1938). The doctrine is applied in a number of different situations and is, like most judicial doctrines, subject to numerous exceptions.[9] Application of the doctrine to specific cases requires an understanding of its purposes and of the particular administrative scheme involved.

Perhaps the most common application of the exhaustion doctrine is in cases where the relevant statute provides that certain administrative procedures shall be exclusive. See *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41 (1938) (National Labor Relations Act). The reasons for making such procedures exclusive, and for the judicial application of the exhaustion doctrine in cases where the statutory requirement of exclusivity is not so explicit, are not difficult to understand. A primary purpose is, of course, the avoidance of premature interruption of the administrative process. The agency, like

---

[9] See, *e. g.*, Layton & Fine, The Draft and Exhaustion of Administrative Remedies, 56 Geo. L. J. 315, 322–331 (1967).

a trial court, is created for the purpose of applying a statute in the first instance. Accordingly, it is normally desirable to let the agency develop the necessary factual background upon which decisions should be based. And since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise. And of course it is generally more efficient for the administrative process to go forward without interruption than it is to permit the parties to seek aid from the courts at various intermediate stages. The very same reasons lie behind judicial rules sharply limiting interlocutory appeals.

Closely related to the above reasons is a notion peculiar to administrative law. The administrative agency is created as a separate entity and invested with certain powers and duties. The courts ordinarily should not interfere with an agency until it has completed its action, or else has clearly exceeded its jurisdiction. As Professor Jaffe puts it, "[t]he exhaustion doctrine is, therefore, an expression of executive and administrative autonomy." [10] This reason is particularly pertinent where the function of the agency and the particular decision sought to be reviewed involve exercise of discretionary powers granted the agency by Congress, or require application of special expertise.

Some of these reasons apply equally to cases like the present one, where the administrative process is at an end and a party seeks judicial review of a decision that was not appealed through the administrative process. Particularly, judicial review may be hindered by the failure of the litigant to allow the agency to make a factual record, or to exercise its discretion or apply its expertise. In addition, other justifications for requiring exhaustion in cases of this sort have nothing to do with the dangers

[10] L. Jaffe, Judicial Control of Administrative Action 425 (1965).

of interruption of the administrative process. Certain very practical notions of judicial efficiency come into play as well. A complaining party may be successful in vindicating his rights in the administrative process. If he is required to pursue his administrative remedies, the courts may never have to intervene. And notions of administrative autonomy require that the agency be given a chance to discover and correct its own errors. Finally, it is possible that frequent and deliberate flouting of administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures.

In Selective Service cases, the exhaustion doctrine must be tailored to fit the peculiarities of the administrative system Congress has created. At the heart of the Selective Service System are the local boards, which are charged in the first instance with registering and classifying those subject to the Selective Service laws. 32 CFR § 1613.1 *et seq.*, §§ 1621.1–1623.10 (1969). Upon being classified by the local board, the registrant has a right of appeal to a state appeal board, 32 CFR § 1626.2 (1969), and, in some instances, to the President, 32 CFR § 1627.3 (1969). No registrant is required to appeal.[11] A registrant cannot be ordered to report for induction while his classification is being considered by the local board or by an appeal board. 32 CFR §§ 1624.3, 1625.14, 1626.41, 1627.8 (1969).

At some stage during this process, normally shortly before he is expected to be ordered to report for induction, see 32 CFR § 1628.11 (1969), the registrant is required to complete a pre-induction physical examination. If he passes this examination, he ordinarily will be ordered to

---

[11] The Notice of Classification form, SSS Form 110, informs the registrant of his right to appeal, but does not inform him that failure to appeal may bar a subsequent challenge to the validity of his classification.

report for induction. The next, and last, step is to report to the induction center and submit to induction. At this point, the administrative process is at an end.

If the registrant fails to report for induction, he is, like petitioner in the present case, subject to criminal prosecution. Although the Universal Military Training and Service Act, as it stood at the time of petitioner's trial, provided that the decisions of the local boards were "final," it was long ago established that a registrant charged with failure to report can raise the defense that there was "no basis in fact" for his classification. See *Estep* v. *United States,* 327 U. S. 114, 123 (1946). It is also established that there can be no judicial review at all, with some exceptions, until the registrant has refused to submit to induction and is prosecuted, or else has submitted to induction and seeks release by habeas corpus.[12]

This case raises a different question. We are not here faced with a premature resort to the courts—all admin-

---

[12] These judicially created doctrines were recently enacted as § 10 (b) (3) of the Military Selective Service Act of 1967, 81 Stat. 104. Section 10 (b) (3) provides in pertinent part:

"No judicial review shall be made of the classification or processing of any registrant by local boards, appeal boards, or the President, except as a defense to a criminal prosecution . . . after the registrant has responded either affirmatively or negatively to an order to report for induction . . . . *Provided,* That such review shall go to the question of the jurisdiction herein reserved to local boards, appeal boards, and the President only when there is no basis in fact for the classification assigned to such registrant." 50 U. S. C. App. § 460 (b) (3) (1964 ed., Supp. III).

We have recently had occasion to interpret this section in the context of pre-induction challenges to classifications. See *Clark* v. *Gabriel,* 393 U. S. 256 (1968); *Oestereich* v. *Selective Service Board,* 393 U. S. 233 (1968). We have granted certiorari in *Breen* v. *Selective Service Board,* No. 1144, cert. granted, 394 U. S. 997, to consider the applicability of § 10 (b) (3) to pre-induction challenges to allegedly "punitive" reclassifications.

istrative remedies are now closed to petitioner. We are asked instead to hold that petitioner's failure to utilize a particular administrative process—an appeal—bars him from defending a criminal prosecution on grounds which could have been raised on that appeal. We cannot agree that application of the exhaustion doctrine would be proper in the circumstances of the present case.

First of all, it is well to remember that use of the exhaustion doctrine in criminal cases can be exceedingly harsh. The defendant is often stripped of his only defense; he must go to jail without having any judicial review of an assertedly invalid order. This deprivation of judicial review occurs not when the affected person is affirmatively asking for assistance from the courts but when the Government is attempting to impose criminal sanctions on him. Such a result should not be tolerated unless the interests underlying the exhaustion rule clearly outweigh the severe burden imposed upon the registrant if he is denied judicial review.[13] The statute as it stood when petitioner was reclassified said nothing which would require registrants to raise all their claims before the appeal boards.[14] We must ask, then, whether there is in this case a governmental interest compelling enough to outweigh the severe burden placed on petitioner. Even if there is no such compelling interest when petitioner's case is viewed in isolation, we must also ask whether allowing all similarly situated registrants to bypass administrative appeal procedures would seriously impair the Selective Service System's ability to perform its functions.

The question of whether petitioner is entitled to exemption as a sole surviving son is, as we have seen, solely

---

[13] See *Yakus* v. *United States*, 321 U. S. 414 (1944).

[14] The 1967 amendment, see n. 12, *supra*, makes no reference to exhaustion of administrative remedies as a prerequisite to challenging the validity of a classification as a defense to a criminal prosecution for refusal to submit to induction. The legislative history of that

one of statutory interpretation. The resolution of that issue does not require any particular expertise on the part of the appeal board; the proper interpretation is certainly not a matter of discretion.[15] In this sense, the issue is different from many Selective Service classification questions which do involve expertise or the exercise of discretion, both by the local boards and the appeal boards.[16] Petitioner's failure to take his claim through all available administrative appeals only deprived the Selective Service System of the opportunity of having

---

amendment indicates that Congress was concerned with certain judicial decisions allowing pre-induction review of selective service classifications and the possibility that such "litigious interruption" might seriously affect the administration of the Selective Service System. See *Oestereich* v. *Selective Service Board,* 393 U. S. 233, 245–252 (1968) (dissenting opinion).

[15] Of course, it is necessary that the local board, which has the responsibility of classifying registrants in the first instance, be given the information necessary to perform its function. However, the present case does not present an instance where a registrant is trying to challenge a classification on the basis of facts not presented to the local board. In such a case, the smooth functioning of the system may well require that challenges to classifications based upon facts not properly presented to the board be barred. In the case before us, the board was aware of the relevant facts when it made its decision to reclassify petitioner I–A; no further factual inquiry would have been at all useful.

[16] Conscientious objector claims, Military Selective Service Act of 1967, § 6 (j), 81 Stat. 104, 50 U. S. C. App. § 456 (j) (1964 ed., Supp. III), or deferments for those engaged in activities deemed "necessary to the maintenance of the national health, safety, or interest," *id.,* § 6 (h) (2), 81 Stat. 102, 50 U. S. C. App. § 456 (h) (2) (1964 ed., Supp. III), would appear to be examples of questions requiring the application of expertise or the exercise of discretion. In such cases, the Selective Service System and the courts may have a stronger interest in having the question decided in the first instance by the local board and then by the appeal board, which considers the question anew. 32 CFR § 1626.26. The Selective Service System is empowered by Congress to make such discretionary determinations and only the local and appeal boards have the necessary expertise. See *Thompson* v. *United States,* 380 F. 2d 86 (C. A. 10th Cir. 1967).

its appellate boards resolve a question of statutory interpretation. Since judicial review would not be significantly aided by an additional administrative decision of this sort, we cannot see any compelling reason why petitioner's failure to appeal should bar his only defense to a criminal prosecution.[17] There is simply no overwhelming need for the court to have the agency finally resolve this question in the first instance, at least not where the administrative process is at an end and the registrant is faced with criminal prosecution.[18]

We are thus left with the Government's argument that failure to require exhaustion in the present case will induce registrants to bypass available administrative remedies. The Government fears an increase in litigation and a consequent danger of thwarting the primary function of the Selective Service System, the rapid mobilization of manpower. This argument is based upon the proposition that the Selective Service System will, through its own processes, correct most errors and thus avoid much litigation. The exhaustion doctrine is assertedly necessary to compel resort to these processes. The Government also speculates that many more registrants will risk criminal prosecution if their claims need not carry into court the stigma of denial not only by their local boards, but also by at least one appeal board.

We do not, however, take such a dire view of the likely consequences of today's decision. At the outset, we

---

[17] As noted above, the Selective Service System is not without power to correct its own errors without the intervention of the registrant. See nn. 4 and 5, *supra*.

[18] It is true that we recently made specific reference to the exhaustion doctrine in *Oestereich* v. *Selective Service Board,* 393 U. S. 233, 235–236, n. 5 (1968), a case where all administrative appeals had been exhausted. However, that case involved an attempt to challenge the validity of a classification before receipt of a notice of induction. A registrant's failure to appeal may have different implications if raised in a suit for pre-induction review.

doubt whether many registrants will be foolhardy enough to deny the Selective Service System the opportunity to correct its own errors by taking their chances with a criminal prosecution and a possibility of five years in jail. The very presence of the criminal sanction is sufficient to ensure that the great majority of registrants will exhaust all administrative remedies before deciding whether or not to continue the challenge to their classifications. And, today's holding does not apply to every registrant who fails to take advantage of the administrative remedies provided by the Selective Service System. For, as we have said, many classifications require exercise of discretion or application of expertise; in these cases, it may be proper to require a registrant to carry his case through the administrative process before he comes into court. Moreover, we are not convinced that many in this rather small class of registrants will bypass the Selective Service System with the thought that their ultimate chances of success in the courts are enhanced thereby. In short, we simply do not think that the exhaustion doctrine contributes significantly to the fairly low number of registrants who decide to subject themselves to criminal prosecution for failure to submit to induction. Accordingly, in the present case, where there appears no significant interest to be served in having the System decide the issue before it reaches the courts, we do not believe that petitioner's failure to appeal his classification should foreclose all judicial review.

We do not view the cases of *Falbo* v. *United States,* 320 U. S. 549 (1944), and *Estep* v. *United States,* 327 U. S. 114 (1946), insofar as they concern the exhaustion doctrine, as a bar to today's holding. Neither those two cases, nor any of the other cases decided by this Court,[19]

---

[19] See *Billings* v. *Truesdell,* 321 U. S. 542, 558 (1944); *Gibson* v. *United States,* 329 U. S. 338, 349–350 (1946); *Sunal* v. *Large,* 332 U. S. 174, 176 (1947); *Cox* v. *United States,* 332 U. S. 442, 445, 448 (1947).

stand for the proposition that the, exhaustion doctrine must be applied blindly in every case. Indeed, those cases all involved ministerial or conscientious objector claims, claims that may well have to be pursued through the administrative procedures provided by the Selective Service laws.[20]

## IV.

Finally, we are faced with the argument that petitioner's challenge to the validity of his classification is barred by his failure to report for and pass his pre-induction physical, thus giving the System one last chance to reject him. The Government points to the fact that large numbers of registrants are rejected for physical and mental reasons, and asserts that many criminal trials would be rendered unnecessary if registrants were required to report for a physical before being allowed to challenge their classifications.

We think there are several answers to this argument. First, as we said above, we doubt very much whether very many registrants would pass up the chance to escape service by reason of physical or mental defects and leap immediately at the chance to defend a criminal prosecution. But more importantly, a registrant is under a duty to comply with the order to report for a physical examination[21] and may be criminally prosecuted for failure to comply.[22] If the Government deems it important enough to the smooth functioning of the System to have unfit registrants weeded out at the earliest possible moment, it can enforce the duty to report for pre-induction examinations by criminal sanctions. In the present case, it has not chosen to do so. Petitioner has not been prosecuted for failure to report for his examination; he has been prosecuted for failure to report for induction, a duty

---

[20] See n. 16, *supra.*

[21] See 32 CFR §§ 1628.10, 1628.11 (1969).

[22] See n. 1, *supra.*

he claims he did not have. Therefore, we hold that petitioner's failure to report for his examination should not bar him from challenging the validity of his classification as a defense to his criminal prosecution.

We do not regard *Falbo* v. *United States, supra,* as a bar to this holding. *Falbo* involved an attempt to raise the invalidity of a registrant's classification as a defense to a criminal prosecution for failure to report to a civilian work camp. The Court noted that the defendant had not reported to the work camp and thus had not given the Selective Service System the opportunity to reject him for physical or mental reasons. According to the Court, the "narrow question . . . presented . . . [was] whether Congress has authorized judicial review of the propriety of a board's classification in a criminal prosecution for wilful violation of an order directing a registrant to report for the last step in the selective process." 320 U. S., at 554. The Court held that Congress had not authorized such review.

*Falbo* was limited by *Estep* v. *United States, supra,* which held that a registrant could secure limited judicial review of his classification in a criminal prosecution for failure to report if he had pursued his administrative remedies to an end. In *Estep,* the registrant had reported, had been accepted for induction, but had refused to be inducted.

The holding of the Court in *Falbo* was based in part on a fear of litigious interruption of the Selective Service System. We have dealt with that problem in other cases. See *Clark* v. *Gabriel,* 393 U. S. 256 (1968); *Oestereich* v. *Selective Service Board,* 393 U. S. 233 (1968). It is not presented here. As noted above, the administrative process in this case is at an end.

Finally, the Court in *Falbo* was concerned with the possibility that a registrant might be rejected for physical or mental reasons, thus making a criminal prosecution

unnecessary. But, as we have seen, the Selective Service System has ample means to ensure that the great majority of registrants will report for their pre-induction examinations. At the time *Falbo* was decided the regulations provided that the pre-induction examination was to be given at the time the registrant responded to the order to report for induction or to the work camp. See *Gibson* v. *United States,* 329 U. S. 338 (1946). Accordingly, the Selective Service System had no way to enforce the duty to report for an examination other than by a prosecution for failure to report for induction. An invalid classification, if allowed to be raised, would have been a complete defense to that prosecution; it would not be a defense today to a prosecution for failure to report for a pre-induction examination.

We hold that petitioner's failure to appeal his classification and failure to report for his pre-induction physical do not bar a challenge to the validity of his classification as a defense to his criminal prosecution for refusal to submit to induction. We also hold that petitioner was entitled to exemption from military service as a sole surviving son. Accordingly, we reverse the judgment of the court below and remand the case for entry of a judgment of acquittal.                  *It is so ordered.*

Mr. Justice Douglas, concurring.

The principle of *Oestereich* v. *Selective Service Board,* 393 U. S. 233, should dispose of this case. There a registrant was plainly entitled to a statutory exemption from service because he was a divinity student. Yet he was denied the exemption because, having burned his draft card, he was classified as a "delinquent" by Selective Service. He challenged that action in a civil suit for pre-induction review; and we granted relief.

This is not a suit for pre-induction review, but a defense tendered in a criminal prosecution. This statutory

exemption is as clear as the one in *Oestereich*. The "sole surviving" son of a family whose father had been killed in action is exempt and there can hardly be any argument that petitioner is such a "son" though both his father and mother are dead. He is indeed the last male heir of the line and therefore one who Congress charitably decided should not be exposed to the chance of death in warfare.

If Oestereich could raise his claim to statutory exemption in a civil suit at a pre-induction stage, it follows *a fortiori* that petitioner can do so in a criminal prosecution for failure to obey the Act's mandate.

The truth of the matter is that it was the Selective Service Board that acted in a "lawless" manner;* and when its error is so egregious, it would be a travesty of justice to require a registrant—whether or not sophisticated—to pursue the administrative remedies that are designed for quite different categories of cases.

Mr. Justice White, concurring in the result.

The Court's opinion, as I understand it, does not dispense with the necessity of presenting an issue under the draft laws to the registrant's local board for consideration in the first instance. Petitioner did exactly this, and by its decision, the Court provides no avenue for totally bypassing the Selective Service System and using the courts as an alternative to the local draft boards. Any decision to the contrary would be inconsistent with the well-established principle that the responsible admin-

---

*While questions of law are usually routed through the available administrative machinery (see *Udall* v. *Tallman*, 380 U. S. 1, 16), that principle evolved under regulatory schemes where agencies had general oversight and supervision over companies or other groups of individuals. See *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41, 51. Arguably, these Selective Service boards have no claim to that kind of expertise. But assuming that they do, the present "legal" question is too transparent to be dignified in that manner.

istrative agency must be given "an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Unemployment Compensation Commission of Alaska* v. *Aragon,* 329 U. S. 143, 155 (1946). See generally 3 K. Davis, Administrative Law Treatise § 20.06 (1958). But presentation of the issue to the agency for consideration in the first instance does not complete the litigant's task under the exhaustion doctrine if he would seek resolution of that same issue in the courts. On the contrary, he must resort to appellate remedies available within the agency, and only after those remedies have been exhausted can he turn to the courts for review. See, *e. g., United States* v. *Sing Tuck,* 194 U. S. 161 (1904); *Chicago, M., St. P. & P. R. Co.* v. *Risty,* 276 U. S. 567, 575 (1928).

It is petitioner's failure to exhaust appellate remedies available within the Selective Service System which presents the obstacle to the challenge of his classification in the courts. And while this facet of the exhaustion doctrine, like its other facets, admits of exceptions when special circumstances warrant, see, *e. g., Donato* v. *United States,* 302 F. 2d 468 (C. A. 9th Cir. 1962), I cannot agree with the Court's apparent conclusion that petitioner's failure to exhaust appellate remedies within the System can be disregarded on the broader ground that only a question of law is involved. Questions of law have not, in the past, been thought to be immune from exhaustion requirements. See, *e. g., Myers* v. *Bethlehem Shipbuilding Corp.,* 303 U. S. 41 (1938). Indeed, this Court has often emphasized that the expertise of the responsible agency is entitled to great deference in matters of statutory construction,[1] see, *e. g., Udall* v. *Tallman,*

---

[1] The fact that the relevant statute is ambiguous or uncertain, *e. g., Logan* v. *Davis,* 233 U. S. 613, 627 (1914), or that the agency's interpretation of a statute comes while its interrelationship with the other parts of the regulatory scheme is as yet "untried and

380 U. S. 1, 16 (1965), thus refuting any contention that questions of law are somehow beyond the expertise of the agency and do not give rise to the considerations which underlie the exhaustion doctrine.

Although I would stop far short of the broad strokes used by the Court in this respect, I do agree that petitioner's failure to exhaust appellate remedies does not bar review of his classification on the facts of this case. Undoubtedly, Congress could require such exhaustion as a prerequisite to judicial review, see, e. g., *Yakus* v. *United States*, 321 U. S. 414 (1944), but Congress has not chosen to do so.[2] In the absence of any such requirement, I do

---

new," *Norwegian Nitrogen Prods. Co.* v. *United States*, 288 U. S. 294, 315 (1933), may accord the agency interpretation of the statute additional significance. And since the construction of the sole surviving son exemption is "essentially a question of first impression," *ante*, at 190, the importance of exhaustion—or of a failure to exhaust—is, perhaps, accentuated in this case. Any ambiguity in the language and legislative history of the statute, or any question as to the role which § 6 (*o*) must play in the statutory scheme would be well suited to resolution by the Selective Service System in the first instance. Exhaustion of appellate remedies within the System would have afforded that agency full opportunity to apply its expertise to these and other questions, thereby facilitating the disclosure of factors which, although germane, are not highly visible to tribunals less familiar with the regulatory scheme.

[2] Compare *Falbo* v. *United States*, 320 U. S. 549 (1944). Section 10 (b)(3) of the Military Selective Service Act of 1967, 81 Stat. 104, prescribes the timing of judicial review—"after the registrant has responded either affirmatively or negatively to an order to report for induction"—but does not speak to the exhaustion question.

It should be noted that where agency orders are not suspended during the pendency of an administrative appeal, Congress has seen fit to permit judicial review without exhaustion of appellate remedies. Administrative Procedure Act § 10 (c), 5 U. S. C. § 704 (1964 ed., Supp. III). Under that section, however, if the agency action is inoperative during administrative review, the agency may require exhaustion by its own rules. Since induction may not be ordered during a registrant's appeal, 32 CFR §§ 1626.41, 1627.8 (1969), the

not think review of petitioner's classification is an impermissible encroachment upon the bailiwick of the Selective Service System. We are not faced with a situation in which consideration of the issue involved has stopped at the first level of the administrative machinery. Rather, petitioner's case and the scope of the § 6 (*o*) exemption for sole surviving sons have received the attention of both the State and the National Directors of the Selective Service System. Petitioner has not exhausted the channels for formal appellate review within the System, but the informal review given petitioner's case and the ratification by the State and National Directors of the position taken by petitioner's local board are sufficient justification to permit the courts to entertain petitioner's defense that his classification is improper under § 6 (*o*).

---

Selective Service System could require exhaustion even if subject to § 10 (c) of the APA. The administration of the draft laws, however, is not covered by the APA, and the necessity for exhausting appellate remedies would seem to rest on the general doctrine developed by the courts.