Michael J. LENTINE, Jr., Petitioner,

v.

General James HOLLINGSWORTH, Commanding General, Fort Jackson, South Carolina, Respondent.

Civ. A. No. 69–650.

United States District Court
D. South Carolina,
Columbia Division.

Jan. 15, 1970.

**318**

James L. Mann, II, and Jack McGuinn, Columbia, S. C., for petitioner.

Joseph O. Rogers, Jr., U. S. Atty., Wistar D. Stuckey, Asst. U. S. Atty., Columbia, S. C., for respondent.

## OPINION AND ORDER

DONALD RUSSELL, District Judge.

The petitioner seeks, by this proceeding in *habeas corpus,* to invalidate his induction into the military service under the provisions of the Military Selective Service Act of 1967.[1]

After the respondent had filed his return, a hearing on the petition was had. At such hearing before this Court in Columbia, South Carolina, on September 29, 1969, the Selective Service records of the petitioner were admitted in evidence without objection. The petitioner, his wife, and a psychiatrist, also, testified in person on behalf of the petitioner. Subsequently, the respondent requested a reopening of the case to permit the introduction of additional testimony. The motion was granted and an additional hearing was had before this Court at Spartanburg, South Carolina, on January 2, 1970. At this hearing, the respondent offered the testimony of a member of the petitioner's Selective Service Board and a stipulation.

On the basis of the record thus made, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Petitioner, at the time a resident of Sumter, South Carolina, became eight-een on December 8, 1964. He apparently registered promptly with his proper local board (Sumter No. 43) and filed with it on February 15, 1965, his classification questionnaire. He was granted a student-deferment classification (S–1). This classification was renewed from time to time thereafter as the registrant moved from high school to Clemson University and transferred from Clemson University to the University of South Carolina.

2. Because of academic deficiencies, however, he was reclassified I–A on December 1, 1967, and at the same time was advised of his right to appeal such reclassification within thirty (30) days. He took no steps to appeal within the allowed time and on January 2, 1968, he was ordered by his local board to report for physical examination on January 25, 1968. He was thereafter notified by notice dated January 29, 1968, to report for induction on February 28, 1968. On February 6, 1968, the petitioner belatedly applied for a student-deferment classification because of enrollment at the University of South Carolina. Such application for student-deferment classification, though tardy, was approved by his local board and the prior order for induction cancelled.

3. Again, on October 23, 1968, the registrant was reclassified I–A because of a failure to correct certain academic deficiencies. Again, he did not appeal such reclassification within time. However, over two months after his reclassification, he wrote the board on December 27, 1968, that he had discussed on that day with the clerk of the board his reclassification and understood that under such classification he "could be called up for induction soon". He explained his delay in seeking deferral by stating that receipt of his reclassification notice had just reached him.[2] He requested

1. 50 App. U.S.C.A. § 451 et seq.

2. See, 32 C.F.R. 1641.3: *"Communication by mail.* It shall be the duty of each registrant to keep his local board advised at all times of the address where mail will reach him. \* \* \* "

See, also, United States v. Beaver (C.C.A.N.C.1962) 309 F.2d 273, 276, cert. denied 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499.

that the board give him "four academic years" (i. e., to June 1, 1969) to finish his education, assuring the board he had "no wish to avoid" his military obligation. After detailing somewhat his academic problems, he added that, "I can assure you that I shall graduate within the time" requested. He emphasized that he wished to "enter the service as a college graduate" and concluded that a delay "until summer" for his induction would be "mutually advantageous—for me (him) and for my (his) country".

4. The board, apparently not noting his letter of December 27, by letter dated January 6, 1969, ordered him to report for induction on January 30, 1969. On January 15, the board, however, taking note of registrant's letter of December 27, requested the advice of the State Selective Service Headquarters on whether "this registrant should be given further consideration for a student deferment and if not does the information in this letter warrant(s) his file being sent to the Appeal Board if the board wishes to extend his appeal rights". The next day the secretary of the board advised the petitioner that the advice of the State Headquarters had been sought in his case and that the board would meet on January 23. On January 17, State Headquarters replied to the inquiry of the board, stating that, "It is our opinion on the basis of this review that the registrant's processing as a student by the local board has been consistent with selective service policy. It does not appear from an examination of the cover sheet that the registrant is entitled to

any further consideration." The letter concluded with the statement: "The registrant's selective service file is returned for processing in the normal manner." On January 20, the secretary of the board notified the petitioner of the advice received from State Headquarters but advised him that, if he wished, he could appear before the board at 10:30 a. m. on January 23, 1969.

5. At this point, the petitioner determined not to appear before the local board but to approach the State Director. As a result of petitioner's personal appeal, the State Director requested from the local board petitioner's file and, on the basis of the petitioner's assurance that he was enrolling for his final semester at the University of South Carolina, authorized the *postponement* by the local board of the petitioner's induction until June 1, 1969. Pursuant to such authorization, the local board advised the petitioner on March 14, 1969, of such postponement.[3]

6. The petitioner did not, however, enroll at the University of South Carolina, as he had assured the State Director he was doing, and on the basis of which his notice to report had been postponed. Nor did he advise either State Headquarters or his local board of his failure so to enroll. However, on April 9, 1969, *more than two months after the commencement of the semester that the petitioner had assured Colonel Collins he was going o enroll in,* the University itself notified the board that the petitioner had not enrolled. This was the first notice either the board or State Headquarters had that

3. For the difference between a postponement of induction and a cancellation of induction, see, Davis v. United States (C.C.A.Iowa, 1969) 410 F.2d 89, 93: "There is a significant difference between a cancelled induction order and one that is postponed. See generally, United States v. Sandbank, 403 F.2d 38 (2d Cir. 1968). The regulations specify that a postponement does not invalidate an induction order but rath-

er operates only to defer the reporting date. When there has been a postponement, the registrant is required to report without being issued a new order. 32 C.F.R. 1632.2. When there has been a cancellation, the registrant is not required to report unless a new and subsequent order is issued. He stands in the same position as he would if no induction order had ever been issued."

the petitioner had not enrolled.[4] The board, immediately upon receiving this information, advised the petitioner to report for induction on April 21, 1969. The petitioner then submitted on April 17, 1969, his request for reopening of his classification and for being "considered for a III–A hardship classification on the grounds that my wife is psychologically dependent on me". He stated that his wife had "been treated by Dr. Swanson in Columbia, South Carolina" and expressed the fear that the induction of himself, who represented, to use his words, "the element of her mental security", could very possibly cause his wife to "go off on an emotional tangent and return to a condition of severe mental stress or possible breakdown". On the same day, the petitioner visited the offices of the local board and renewed his request. This represented the first notice that the board had of the plaintiff's marriage, which had occurred almost a month earlier.[5] Actually, the board was not furnished with evidence of the marriage until May 16, 1969, when petitioner provided it with a copy of his marriage license. The clerk pointed out to petitioner that the latter had failed to advise the board that he had not enrolled in school or that he had married. The petitioner gave as his reason for failing to advise the board of either his non-enrollment or his marriage that "he was waiting on us (the board) to contact him". On that same day, the petitioner was advised that the board could not postpone or delay his induction—that only the State Headquarters had the authority to do so.

7. The petitioner did not report for induction on April 21, 1969, as he had been ordered. Instead, on April 30, he renewed his request for reopening of his classification and for a hardship deferment, accompanying it with a letter from a local psychiatrist, who stated that, "For several months prior to her marriage, Mrs. Lentine relied heavily on her husband for emotional support". On May 1, the petitioner telephoned the offices of the board. He was told that the board "would not postpone his induction" unless instructed to do so by the State Headquarters [6] and it was suggested that he see either Colonel Collins or Colonel Morris at State Headquarters. The petitioner, however, told the clerk of the board it would be futile to apply to Colonel Collins "because he was mad with him because he was suppose(d) to take in some additional information from USC and did not do it and that Col. Collins kept his file in his office for a long time". When chided for failure to advise the board of his failure to enroll in February, he again said "he was waiting to hear from us (the board)."

8. Subsequently, on May 13, 1969, the petitioner inquired of the clerk of the board when the board would again meet. Told that the board would meet on May 15, he inquired whether the board would consider "the information he had sent in". He was advised "that the board would look at the information" but that it would only delay his induction if advised so to do by State Headquarters. It was established by testimony that the board did meet on May 15 and did review the petitioner's information. Finding that the petitioner's change of status on which he sought deferment did not result "from circumstances beyond his control", the board refused either to rescind or to postpone the order for induc-

---

4. See, 32 C.F.R. § 1625.1(b):
   "Each classified registrant * * * shall, within 10 days after it occurs, report to the local board in writing any fact that might result in the registrant being placed in a different classification. * * * *"

5. See note 4.

6. Under Selective Service Regulations, a local board may be required to reopen a registrant's classification upon the written request or direction of the State Director. 32 C.F.R. § 1625.3(a) (1969); McKart v. United States (1969) 395 U.S. 185, 189, note 4, 89 S.Ct. 1657, 23 L.Ed. 2d 194; United States v. Buckner (C.C.A.Colorado, 1969) 415 F.2d 1175, 1176.

tion or to reopen petitioner's classification.

9. On May 16, 1969, the petitioner delivered to the board a certified copy of his marriage license, dated March 19, 1969. As has been pointed out, the petitioner married on March 19, 1969. His wife had been a fellow student at the University of South Carolina. Neither was a student at the time of their marriage. They had dated for several years prior to the marriage. The petitioner knew before his marriage that his wife, whose family lived near Washington, had "a record of severe emotional stress". Following the marriage, the wife accepted employment as a receptionist and typist. It does not appear that the petitioner himself was employed.

10. On May 19, 1969, petitioner reported for induction but refused to take the oath. Instead, he went to the offices of the Judge Advocate at the Fort, which, in turn referred him to the office of the Surgeon General at the Fort since he sought release for medical reasons. At the same time, he advised his board that the Surgeon General had "been formally petitioned to intervene" in his case and told the board, "Pending a letter from the Surgeon General, await before taking punitive measures". On the same day, an attorney called the board and requested a full summary of the board's actions in the petitioner's case. The following day (May 20, 1969), the Surgeon General's office, which, following the petitioner's visit of May 19, had placed a "stop induction" order on petitioner's induction, cancelled such order and advised Selective Service Headquarters that "Mr. Lentine could be inducted whenever Selective Service elected to return him".

11. The petitioner was thereupon instructed by his board by letter mailed May 26, 1969, to report for induction in Sumter, South Carolina, on June 2, 1969. He did not so report but on June 2, he went by the offices of the local board 40 in Columbia, and he was told that he was "already under order" and to report for induction on the morning of June 3, 1969. He so reported.

12. After his induction and on July 8, 1969, the petitioner applied to the Army for a hardship separation, based on his wife's dependency on him. In making such application, he stated that his "civilian occupation at time of entry into service" was "Student in last year of undergraduate study at the University of South Carolina". In his letter in support of the application, he stated his wife was "psychologically dependent on me (him) for emotional support" and ascribed the board's failure to reopen his classification and "to postpone my (his) case" because the "local board members felt they knew more than professional medical men about my (his) wife." He attached two statements from close acquaintances of his wife, referring to her "temper tantrums", based, as they concluded, on her feelings of insecurity—"tantrums" which became less frequent after her marriage. This entire application was referred by the Army back to the petitioner's local board, which advised the Army, through State Headquarters, by letter of August 11, 1969, that it would not have considered giving the petitioner a III–A classification on the basis of the facts set forth in such application.

## CONCLUSIONS OF LAW

The application of the petitioner for reclassification and for consideration as a hardship deferee was submitted after the issuance of an order for his induction. While the petitioner's reporting date had been postponed, his original order of induction, dated January 29, 1968, was never cancelled. See, Davis v. United States, *supra* (410 F.2d p. 93). In those circumstances, Selective Service System Regulations expressly provide that the registrant's classification "shall not be reopened" unless the local board makes a specific finding that "there has been a change in the registrant's status resulting from circumstances over which the registrant had no control." 32 C.F.R., § 1625.2. Such a provision "is a

fair regulation for the guidance of the board in extending" exemptions to registrants and is a valid exercise of the authorization given in 50 U.S.C. App. § 460. United States v. Beaver, *supra* (309 F.2d p. 276); United States v. Al-Majied Muhammad (C.C.A.Md.1966) 364 F.2d 223, 224; United States v. Helm (C.C.A. N.C.1967) 386 F.2d 434 435, cert. den. 390 U.S. 958, 88 S.Ct. 1045, 19 L.Ed.2d 1153; United States v. Whitaker (C.C.A. Va.1968) 395 F.2d 664; Straight v. United States (C.C.A.Cal.1969) 413 F.2d 263, 264.[7] It is not permissive, but mandatory: it plainly divests the local board of any power to reopen a registrant's classification after notice to report for induction, unless and until the board has specifically found that there has been an involuntary change in the registrant's status. The change of status, claimed by the plaintiff, arose out of his marriage. Marriage, however, is clearly a voluntary act and does not amount to a change in the registrant's status "resulting from circumstances over which the registrant had (has) no control." Battiste v. United States (C.C.A.Ga.1969) 409 F.2d 910, 915; Ex Parte Albertson (D.C.D.C.1951) 103 F. Supp. 617, 618.

■ It is suggested, however, that the basis of the request for reclassification was, what was for the petitioner, the unanticipated discovery by him after marriage that his wife was in an emo-tional state that required his constant attention. He would argue that his change of status, upon which he bases his claim for reclassification, is thus not his marriage but the unanticipated emotional condition of his wife. Such a claim is refuted by the evidence submitted by the petitioner himself. Thus, in the letter of the psychiatrist submitted by the petitioner in support of his application, it is stated categorically that "For several months prior to marriage, the petitioner's wife had "relied heavily on her husband (the petitioner) for emotional support." His wife's "temper tantrums" and other evidences of emotional instability were thus obvious to petitioner prior to his marriage. By his marriage, he did not walk into an emotional problem which he did not have every reason to understand and to anticipate. The petitioner knew exactly what he was undertaking when he married. His act was not one over which he "had no control"; it was one he voluntarily assumed and thoroughly anticipated. His claim for reclassfication rests entirely on his marriage and the obligations he voluntarily and knowingly assumed thereby.

■ This petitioner contends, also, that he was never given the formal notice of the denial of his application for reclassification, as required under 1625.-4. It will be observed that the disposition of petitioner's application was con-

---

7. In cases involving claims of conscientious objectors, the Second and Tenth Circuits have taken a somewhat different view, based on what they regard as the "crystallization" theory. See, United States v. Gearey (C.C.A.N.Y.1966) 368 F.2d 144, 149–150, cert. den. 389 U.S. 959, 88 S.Ct. 335, 19 L.Ed.2d 368, reh. den. 389 U.S. 1010, 88 S.Ct. 561, 19 L.Ed.2d 611. For a discussion of the conflicts in the circuits, see United States v. Rundle (C.C.A.Iowa 1969) 413 F.2d 329, 334, note 3, and for a listing of the conflicting decisions see United States v. Bittinger (C.C.A.Va.1969) 422 F.2d 1032, decided December 24, 1969. It might be noted that, in the special case of a claim of ministerial exemption, our Circuit in the *Bittinger Case* has seemingly accepted some parts of the "crystal-lization" theory, the Court remarking: "The change from layman to cleric may lie beyond the registrant's control, for much depends on the duties to which the church assigns him. Furthermore, the call to a full-time vocation in the ministry comes to comparatively few men, and the reasons this call may be answered are too complex to be fathomed by perfunctory administrative decision." Fortunately, in this case, the alleged change of status (i. e., marriage) is not marked by any metaphysical obscurity and uncertainty as that involved in *Bittinger* and is, as a matter of law, voluntary. See, Battiste v. United States (C.C.A.Ga.1969) 409 F.2d 910, 914–915.

trolled by 1625.2, which, unlike 1625.4, contains no specific requirement that the board shall advise the registrant that his information "does not warrant the reopening of the registrant's classification". Even if the requirement of 1625.4 as to notice of denial is to be read into 1625.2 and especially its jurisdictional predicate, the notice given thereafter to the petitioner to report was sufficient to satisfy the requirement. United States v. Beaver, *supra* (309 F.2d p. 277).

Moreover, even if there was some irregularity in the proceedings for petitioner's induction, a conclusion I think refuted by the record, still the petitioner could not have been prejudiced and "the law is settled that procedural irregularities in the administration of the Universal Military Training and Service Act, 50 U.S.C.A. App. § 451 et seq. which do not result in prejudice, will not support a claim for relief." United States ex rel. Lipsitz v. Perez (C.C.A.S.C.1967) 372 F.2d 468, 469, cert. den. 389 U.S. 838, 88 S.Ct. 57, 19 L.Ed.2d 100. In the cited case, the irregularity, significantly, involved an alleged failure of the board to give a required notice to a registrant. Even stronger is the recent case of Battiste v. United States, *supra* (409 F.2d pp. 914–915). There, the registrant, after receiving notice to report for induction, married. He, like the petitioner here, applied for reclassification on that account under 1625.2. The clerk of the local board failed to refer the application to the board for consideration and disregarded it. The Court, while recognizing that the board should have had the application referred to it, held there was no prejudice to the registrant and no denial of due process. It emphasized that, on the basis of the registrant's marriage after notice of induction, "the board would have been powerless to reopen appellant's (registrant's) classification unless it specifically found a change in his status over which he had no control". It proceeded to hold that, "Plainly appellant's marriage after the

mailing of an order to report for induction does not amount to such a change in status. Porter v. United States, 7th Cir. 1964, 334 F.2d 792, 794. Appellant (registrant) insists, however, that this decision should be made in the first instance by the local board. We agree. But we cannot agree that the failure of the board to do so can be considered prejudicial under circumstances where, as here, the local board would have been, as a matter of law, without authority to reopen his classification."

See, also, United States v. Smogor (C.C.A.Ind.1969) 411 F.2d 501, 503, where, in denying prejudice in a similar situation where there was a request for reclassification after notice to report for induction, the Court said:

"It follows that the defendant could not have been prejudiced by failure to receive notice from the board that it had denied his application for reclassification. In these circumstances he was not entitled to a hearing, United States v. Beaver, 309 F.2d 273 (4th Cir.1962), or to a personal appearance before the board, 32 C.F.R. 1624, or to an appeal from the board's refusal to open. 32 C.F.R. 1626."

The application for *habeas corpus* relife is denied.

And it is so ordered.