**Paul H. HEIDER, Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

No. 76–186–Civ–J–WC.

United States District Court,
M. D. Florida,
Jacksonville Division.

Sept. 8, 1981.

Samuel S. Jacobson, Jacksonville, Fla., for plaintiff.

Thomas E. Morris, Asst. U. S. Atty., Jacksonville, Fla., for defendants.

## SUMMARY JUDGMENT

HIGBY, District Judge.

This is an action for a judgment declaring how Plaintiff Paul H. Heider's Civil Service pension payments should be calculated. The parties agree that the facts are undisputed and summary judgment is appropriate.

Heider was a Federal Civil Service employee working as a Special Agent with the Bureau of Alcohol, Tobacco and Firearms, Department of the Treasury, GS–1811–12 (Special Agent/Analyst). He retired from active service effective January 31, 1975, with total creditable service of 28 years, 11 months, and 16 days. Upon his retirement Heider became entitled to Civil Service retirement benefits. 5 U.S.C. § 8336(c) (1977).

During his active service Heider's salary included his regular pay and "premium pay." Premium pay is the Civil Service term for compensation for uncontrolled overtime work as a criminal investigator. 5 U.S.C. § 5545(c)(1) (1977). The Civil Service Commission however based Heider's pension only upon his regular compensation. The Commission's Bureau of Retirement, Insurance and Occupational Health gave Heider notice of its position in the annuity statement it provided.

Heider contended that his premium pay ought to be counted in computing his monthly pension payment, pursuant to an amendment to the Civil Service Retirement Act effective January 5, 1975. On May 22, 1975, he wrote a letter to the Commission stating his position. His letter stated:

I am hereby appealing your computation of my annuity . . . and I am requesting such Administrative relief as may be available to me.

I further request that you advise me specifically as to what procedure I must follow to secure administrative relief, citing such regulation or legal sections as are applicable.

The Commission did not reply. Heider wrote again on June 12, 1975. Again he stated, "I am appealing your computation of my annuity . . . and I am further requesting such Administrative relief as may be available to me."

July 30, 1975, the Bureau's section chief replied telling Heider what he already knew—that the Bureau differed with Heider on how his retirement should be calculated. He did not reply to Heider's statement that he was appealing the decision or to the request for information about proper appeal procedures. The Commission never responded to Heider's request for an appeal or information about obtaining administrative review. After the six months period for seeking administrative review, 5 C.F.R. § 831.107, passed, Heider instituted this action.

*Exhaustion of Administrative Remedy*

The United States has moved to dismiss this action for failure to exhaust administrative remedies. That position is wholly unsupported. Indeed raising it in these circumstances is so unjustified that it is an embarrassment to the citizens of this country.

The doctrine of exhaustion of administrative remedies is well established in the jurisprudence of administrative law. See generally 3 K. Davis, Administrative Law Treatise § 20.01 et seq. (1958 ed., 1965 Supp.); L. Jaffe, Judicial Control of Administrative Action 424–458 (1965). The doctrine provides 'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.' *Myers v. Bethlehem Shipbuilding Corp.,*

303 U.S. 41, 50–51, 58 S.Ct. 459 [463] 82 L.Ed. 638, 643, 644 (1938). The doctrine is applied in a number of different situations and is, like most judicial doctrines subject to numerous exceptions. Application of the doctrine to specific cases requires an understanding of its purposes and of the particular administrative scheme involved.

Perhaps the most common application of the exhaustion doctrine is in cases where the relevant statute provides that certain administrative procedures shall be exclusive. See *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938) (National Labor Relations Act). The reasons for making such procedures exclusive, and for the judicial application of the exhaustion doctrine in cases where the statutory requirement of exclusivity is not so explicit, are not difficult to understand. A primary purpose is, of course, the avoidance of premature interruption of the administrative process. The agency, like a trial court, is created for the purpose of applying a statute in the first instance. Accordingly, it is normally desirable to let the agency develop the necessary factual background upon which decisions should be based. And since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise. And of course it is generally more efficient for the administrative process to go forward without interruption than it is to permit the parties to seek aid from the courts at various intermediate stages. The very same reasons lie behind judicial rules sharply limiting interlocutory appeals.

Closely related to the above reasons is a notion peculiar to administrative law. The administrative agency is created as a separate entity and invested with certain powers and duties. The courts ordinarily should not interfere with an agency until it has completed its action, or else has clearly exceeded its jurisdiction. As Professor Jaffe puts it, '[t]he exhaustion doctrine is, therefore, an expression of executive and administrative autonomy.' This reason is particularly pertinent where the function of the agency and the particular decision sought to be reviewed involve exercise of discretionary powers granted the agency by Congress, or require application of special expertise. *McKart v. U. S.*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194, 203 (1969) (footnotes omitted).

Here there are no reasons for requiring exhaustion of administrative remedies. The issue here is strictly statutory construction. Its resolution does not require any particular expertise and does not call for exercise of administrative discretion. *See, McKart v. U. S.*, 395 U.S. 185, 198, 89 S.Ct. 1657, 1665, 23 L.Ed.2d 194, 205 (1969). Heider in his letters asked for administrative review. The Commission ignored the opportunity to resolve this issue internally. No administrative process will be interrupted. The Commission has completed its proceedings.

In this case requiring exhaustion of administrative remedies would serve no legitimate purpose. The motion to dismiss is denied.

### The Statute's Meaning

The dispute here is over the effective date and meaning of an amendment changing the definition of average pay. Heider's retirement annuity is computed using a formula which uses average pay to determine the annuity. 5 U.S.C. § 8339(d)(1) (1977). Average pay is determined by averaging the rate of basic pay in effect over any three consecutive years of creditable service. 5 U.S.C. § 8331(3) (1977). In 1974 Congress amended the statutes governing retirement. Act of July 12, 1974, Pub.L. 93–350, 88 Stat. 355. The amendment, among other things, included premium pay in the definition of basic pay. Premium pay is essentially pay for uncontrolled and unpredictable overtime work, Title 5, United States Code, Section 5545(c)(2) (1977), a condition common in law enforcement work.

The amendment adding premium pay to the definition of basic pay took effect the first applicable pay period beginning after December 31, 1974. Act of July 12, 1974, Pub.L.No. 93–350, § 7, 88 Stat. 356. As Heider sees it any covered law enforcement officer who retired after December 31, 1974, is entitled to include in the average pay computation any premium pay earned in the three year period used regardless of whether the premium pay was earned before or after December 31, 1974. The Government has a different view of things. It believes only premium pay earned after the effective date of the amendment can be included in basic pay computation. The issue is the statute's interpretation.

Interpreting a statute starts with consideration of its plain words. *Garcia v. Gloor*, 618 F.2d 264 (5th Cir. 1980). The plain words here are not particularly instructive. They simply say the amendment shall become effective at a certain date. When the plain words are not enough, an act should be considered in its entirety and its legislative history examined. *Payne v. Panama Canal Co.*, 607 F.2d 155 (5th Cir. 1979); *Graff Chevrolet Co. v. Campbell, Jr.*, 343 F.2d 568 (5th Cir. 1965). Consideration of the entire act containing the amendment and the act's legislative history is more illuminating and convinces me the Government's position is correct.

Inclusion of premium pay in basic pay calculation was one of several changes made by Public Law 93–350 in the statutes governing retirement of federal law enforcement officers. It established a mandatory retirement at age 55 or completion of 20 years of service beyond age 55, whichever comes later. Act of July 12, 1974, Pub.L.No. 93–350 § 4, 88 Stat. 356, 5 U.S.C. § 8335(b) (1977). It also increased the factor used to compute an annuity from 2% to 2½ for the first 20 years of service while keeping it at 2% for years of service beyond 20. Act of July 12, 1974, Pub.L.No. 93–350 § 6, 88 Stat. 356, 5 U.S.C. § 8339(d)(1) (1977). The purpose of these changes was to compel early retirement of law enforcement officers while making retirement as lucrative as it is in other branches of government service which do not force early retirement. S.Rep.No. 93–948, 93d Cong., 2d Sess. (1974), *reprinted in* [1974] 2 U.S.Code Cong. & Ad.News 3698. Inclusion of premium pay in basic pay computation was part of this design.

Because of the way these changes were to work together different provisions had different effective dates. Mandatory retirement took effect January 1, 1978. Act of July 12, 1974, Pub.L.No. 93–350 § 7, 88 Stat. 356. Premium pay inclusion took effect December 31, 1974. *Id.* The difference in effective dates had a specific purpose. Delayed effectiveness of mandatory retirement afforded "present employees a three-year opportunity during which premium pay will be included in base pay, thus enhancing their annuities." S.Rep.No. 93–948, 93d Cong., 2d Sess. (1974), *reprinted in* [1974] 2 U.S.Code Cong. & Ad.News 3698 at 3701.

Consideration of this statement in light of premium pay's definition shows only premium pay earned after the amendment's effective date was meant for inclusion in basic pay calculation. If all premium pay ever earned were eligible for consideration, there would have been no need for the three year hiatus before enforcement of mandatory retirement. Premium pay is not pay a law enforcement officer may accept or reject. It is compensation for the uncontrolled, unpredictable overtime work inherent in law enforcement. Thus an employee does not choose it; it is thrust upon him. The three year period then could not be a time for officers to seek out premium pay. It is a period during which premium pay thrust upon them will be included in basic pay.

The length of the period between effective dates buttresses this conclusion. Three consecutive years is the period used to determine average pay. 5 U.S.C. § 8331(4) (1977). This symmetry also leads to the conclusion that Congress contemplated only premium pay earned after the amendment took effect would be used in basic pay calculation.

Summary judgment is granted the Defendant. Only premium pay earned after the effective date of the amendment must be included in computation of Heider's basic pay. The Clerk shall assess all lawful costs against Heider.