**Christopher D. RHODES, Appellant,**

v.

**Ione A. BATILLA, Appellee.**

**No. A14–92–00154–CV.**

Court of Appeals of Texas,
Houston (14th Dist.).

Feb. 18, 1993.

Rehearing Denied March 18, 1993.

the advice of the company attorney, Batilla had someone witness her tender of checks for the taxes to Randolph for his signature. Randolph would either refuse to sign the checks or tear them up. As a result, the ROF payroll taxes were not paid.

In January 1986, Batilla received a call from Mr. Bean with the IRS regarding ROF's unpaid FICA taxes for 1984 and the first quarter of 1985. Mr. Bean wanted to determine if Batilla was a "responsible person" for purposes of assessing a 100% penalty against her, i.e., essentially collecting the unpaid company taxes from her. Batilla called her CPA, Jim Orick (Orick), and told him about the call from the IRS. Orick officed in the same building as appellant, and he referred Batilla to appellant for advice. Orick indicated to Batilla that appellant was a tax expert and could represent her. On January 27, 1986, Batilla called appellant, told him that Orick had referred her, and asked if appellant could help her. Batilla testified appellant assured her he could help. She told appellant of the phone call from Mr. Bean and that the IRS had requested a personal interview. Appellant told Batilla to "go down and talk to Mr. Bean and then come and see him after [she] spoke with Mr. Bean." She testified appellant further advised her "he would call Mr. Bean" and he indicated that "everything would be all right." Further testimony shows appellant told her there would be a $500 retainer fee and "that he would help" her. They set an appointment for early February to meet in person. The same day as this initial telephone consultation, January 27, 1986, appellant filled out a time-slip charging one-half hour to Batilla's account for "several telephone conferences with client [and] [t]elephone call to Mr. Beene of IRS." On January 28, 1986, appellant filled out a time-slip for Batilla's account reflecting one hour for "[p]reparation of Power of Attorney and letter to Mr. Beene." At trial, however, appellant testified he really was not retained to represent Batilla, and did not know "whether [he] actually transcribed" the letter.

W. Stephen Rodgers, Charles Escher, Houston, for appellant.

David A. Furlow, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and SEARS and ELLIS, JJ.

## OPINION

SEARS, Justice.

Ione A. Batilla (Batilla), appellee, brought suit for legal malpractice against Christopher D. Rhodes, appellant. Trial was to a jury which found gross negligence in appellant's handling of Batilla's tax defense from the Internal Revenue Service (IRS). Judgment was entered on the verdict in favor of Batilla, awarding her $125,500 in actual, and $125,000 in exemplary, damages. Appellant raises 22 points of error. We affirm.

Batilla's tax liability arose in connection with her employment at Randolph Office Furniture (ROF). Batilla was employed by ROF in January 1980 and left the company in December 1984. While she was with ROF she was employed as controller. She did the company books, worked with a company called ADP to issue payroll checks, and oversaw the purchasing department. Batilla, however, had no authority to sign company checks, even on the payroll account, without the owner's approval. In 1984 and 1985, the company was having financial trouble and eventually went into Chapter 7 bankruptcy. During this time period, the owner, George Randolph (Randolph), refused to approve any checks to pay the company's FICA payroll taxes. At first, ADP would automatically send the payroll taxes to the IRS. However, after two of these drafts bounced, ADP notified Randolph it would not handle the payroll taxes and would not be responsible for nonpayment of these taxes. Thereafter, on

A couple of days after Batilla received the call from the IRS, Larry Owens (Owens), a past president of ROF, also received a call from Mr. Bean about the unpaid taxes. Batilla and Owens agreed to meet and go see the IRS agent together on February 6, 1986. Owens testified he did not want "to go to the IRS without professional help," and he asked his long-time friend Joe Hart (Hart), a CPA, to go with him. When they got to the IRS building, Hart told them they would have to sign a power of attorney before he could go into the meeting with them. Owens and Batilla signed a power of attorney on the trunk of the car. Hart went in with them and the meeting was a very unpleasant experience. Mr. Bean was "intimidating and rather rough," and treated them as guilty until proven innocent. He refused to let them leave the office until they filled out and signed a Form 4180. Batilla testified that Mr. Bean explained that this form "was not an admission of guilty, but just that [they] had showed up for the meeting." However, Mr. Bean told Batilla if she did not fill out the form he would assess all of the penalty against her. They were not allowed to take the documents with them, get professional help in filling them out, or make any phone calls to get assistance. Further, they were not allowed to talk to each other while filling them out. Batilla was extremely upset, nervous, "scared to death," and crying during this process.

On February 13, 1986, Batilla and Owens met appellant. Batilla took a copy of her Form 4180 with her to the meeting. She went over it with appellant explaining that in the stress of the moment she had made some mistakes on the form. The most glaring mistake was that she claimed employment at ROF for 1985, while in reality she was not employed there during 1985. She and Owens gave appellant the facts and explained that neither one was a "person responsible" for the payment of ROF's payroll taxes. They provided him with the names, addresses and phone numbers of witnesses who could verify these facts. They discussed the various company bank accounts and they specified on which accounts Batilla and Owens could and could not sign. Batilla explained to appellant that the unpaid FICA taxes came out of the operating account and that she never had signature power on that account. She further told appellant how Randolph would refuse to sign, or would tear-up, the checks to the IRS for the payroll taxes. Appellant, however, testified he did not reduce these facts to writing in order to follow up and investigate, even though this information was vital to Batilla's defense. In fact, appellant took absolutely no notes of this or any other conversation with Batilla, and stated at trial that he did not think it was important to take notes in order to get the facts straight.

At this initial meeting, appellant told them he was a "tax specialist." That he had extensive experience with 100 percent penalty cases and that he was an expert in that area. He explained that his hourly rate was $125 an hour, and had Batilla and Owens each sign a power of attorney. He told Batilla that she had a defendable case. He further indicated she would win, but the case might have to go to trial and that would cost $7,000 to $10,000. Batilla told him at that time she did not have the money to go to court and she wanted him to present the facts to the IRS so they would know she was not a "person responsible" for the taxes. Appellant told both Batilla and Owens he would keep them informed and send them copies of any letters he wrote.

Appellant filled out time-slips that same day, charging .4 of an hour to Batilla for "[p]reparation of Form 2848," and 1.5 hours for "[c]onference with client." Batilla and Owens were subsequently each sent a bill for the $500 retainer fee, which they both paid to appellant. In May 1986, Batilla received a letter from the IRS indicating that efforts to collect the taxes from Randolph had not resulted in payment. The letter went on to state the IRS proposed to assess all of the penalty against Batilla, and if she agreed to the assessment she was to sign the attached Form 2751. Batilla called appellant and told him she "was not going to sign anything." She informed appellant "he needed to call them up and

take care of it and give them the facts that he had not given them." Appellant indicated that he would take care of it.

Appellant's time-slips indicate no further activity until June 6, 1986 when he charged Batilla 1.3 hours for "[p]reparation of Letter of Protest [and] [r]eview of notice received regarding 100% penalty," and 2.0 hours for "[p]reparation of protest [and] [r]eview of files for L'Lani corporation." When Batilla got a copy of the protest letter which appellant sent to the IRS, she immediately called appellant to tell him the information in the letter was incorrect and that he needed to give them the true facts. Appellant told her he would take care of it. However, appellant never corrected any of the facts in the protest letter, and testified at trial he was not concerned that the letter contained totally inaccurate information "because it was to the best of [his] knowledge at that time."

In 1986, appellant also gave Batilla advice on protecting her family from tax liability. Mr. Bean had told Batilla he would garnish her wages and her husband's wages. In response, appellant told Batilla the only way she could prevent the IRS from taking her money was to get a "paper divorce," give her assets to her husband, and put any equity that she had in a trust fund for her son. Batilla followed this advice even though her husband was against the idea. Due to the stress of the tax problems and her husband's unhappiness over the divorce, their "paper divorce" became a real divorce.

After the protest letter was sent, appellant's time-slips reflect no further activity on behalf of Batilla until January 20, 1987. In 1987, appellant had several telephone conferences with IRS representatives, met with Larry Fagen (Fagen) of the IRS, talked to Batilla once, talked to Owens at least twice, spent a maximum of three hours researching the law, and sent a letter to Fagen. At the meeting with Fagen, appellant was requested to bring "facts, arguments, and legal authority" to support Batilla's position. Any statements appellant brought to the meeting were to be "in affidavit form or signed under penalty of perjury." However, appellant presented an argument to Fagen at the meeting unsupported by any facts or legal authority. He took no case authority with him to the meeting, and he failed to obtain affidavits from Batilla or any of the witnesses, therefore he had no statement of facts to present to the IRS. The obvious result was that the meeting was of zero value to Batilla. If the true facts had been given to the IRS, it would have been apparent Batilla had zero liability.

Appellant's time-slips also indicate he had a telephone conference in 1987 with a "witness;" however, none of the witnesses had ever heard from or spoken to appellant. On June 18, 1987, Fagen sent appellant a letter indicating he had tried to contact appellant and follow up on this matter on March 27, 1987, April 8, 1987, April 27, 1987, and May 20, 1987, but all of these attempts had failed. A copy of this letter from Fagen was also sent to Batilla. She was extremely upset when she received the letter, and immediately called appellant. Batilla was concerned that the IRS still did not know the truth of the matter, i.e., Batilla was *not* a "responsible person" and in fact had no authority to issue checks for payroll deductions. Appellant told her he previously had several conversations with Fagen and that he would submit further information to Fagen. On June 25, 1987, appellant sent Fagen a letter indicating he had received the letter of June 18, 1987 and would be submitting further information by July 8, 1987. Appellant took no action, and never gave the IRS the correct facts. Obviously, the IRS assumed Batilla was a "responsible person" for the ROF taxes, and initiated collection procedures.

Sometime in 1987, appellant signed the same Form 2751 that Batilla told him she would not sign, and in doing so appellant agreed to the assessment of the 100% penalty against Batilla. This form was executed without her knowledge or consent. When he signed the form, he drew a line across the bottom and put an asterisk to the right of the line. Then across the middle of the form next to another asterisk he wrote "[t]axpayer retains the option of filing claim and suit for refund." Appel-

lant never obtained Batilla's consent, never informed her he had signed this form on her behalf, and never sent her a copy of the signed form.

On November 27, 1987, the IRS sent Batilla a letter stating the case was closed "on the basis agreed upon" and the file was to be sent to the service center for account adjustment and interest computation. Batilla frantically tried to contact appellant. After several phone calls, she finally tracked him down in December 1987. She told him about the letter from the IRS, and appellant told her he had done "everything he could" for her. He stated the case was closed, there was nothing else he could do for her, and she would have to get another attorney. Batilla asked if appellant had sent her copies of everything in his files, and he assured her she had copies of all documents and correspondence in the file. He still failed to inform Batilla he had agreed to 100% assessment of the taxes against her.

In February 1988, Batilla received a bill from the IRS for $32,124.31 in unpaid FICA taxes for ROF. Batilla went to the IRS in an attempt to clear up the mistake. She was advised to write out the facts of her case and get affidavits from people with personal knowledge of the events. On March 29, 1988, Batilla prepared a letter stating the facts of her case, supported by five affidavits. In early April 1988, Batilla presented her letter and affidavits to the collection officer, Mr. Amdexter (Amdexter), who refused to listen to anything she had to say. He told her he could seize any asset she had to satisfy the debt.

Batilla was subsequently referred to Ben Stevens (Stevens), and she retained him in April 1988 to represent her in this tax matter. In late April 1988, Stevens discovered that appellant had signed the Form 2751, and agreed to the assessment of the 100% penalty against Batilla. Stevens immediately informed her of the agreement. On May 11, 1988, the IRS filed a Federal Tax Lien against Batilla. She began payment on the tax lien. In January 1989, Batilla retained Mary Heafner to represent

her in this malpractice action against appellant.

In points of error one and two, appellant complains the trial court erred in not making a ruling regarding any "legal errors" he committed, and in rendering judgment for Batilla. He alleges the trial court should not have submitted questions to the jury about his conduct generally, because an evaluation of his acts or omissions as "legal errors" should have been made by the court as a matter of law. Appellant also contends that because his acts or omissions are in uncertain areas of law, they cannot be negligence.

■■■ Generally, the determination of negligence, causation and damages in a legal malpractice action are questions of fact for the jury. *Millhouse v. Wiesenthal*, 775 S.W.2d 626, 627 & n. 2 (Tex.1989). In the professional misconduct case cited by appellant, the court made it clear the jury is to determine these factual issues. *Hebisen v. State*, 615 S.W.2d 866, 867–68 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ). After the jury makes its factual determinations, the court then determines the legal question of "whether such facts found by the jury constitute professional misconduct." *Id.* at 868 (citing *Howell v. Texas*, 559 S.W.2d 432 (Tex.Civ.App.—Tyler 1977, writ ref'd n.r.e.)). If the trial court determines the facts constitute professional misconduct, it then enters judgment in favor of the plaintiff. *See id.* at 867–68.

■■■ Appellant opines that the effect of signing the Form 2751 is uncertain and requires numerous judgment calls, however, this fact does not prevent the jury from finding him negligent in his handling of the case. The fact of the matter is that Rhodes was hired to *defend* Batilla against the tax assessment, and instead he signed a form against her interest which *consented* to the assessment of the tax against her. He signed this form in contravention of his client's instructions that he show the IRS she was not a person responsible for the payment of the tax. Rhodes failed to go to the IRS meeting with the facts and affidavits which would have relieved Batilla of all

liability. In fact he presented incorrect information to the IRS. He advised Batilla to get a "paper divorce" to thwart IRS collection attempts, something a first year law student would have known better than to do. Further, Rhodes failed to appreciate the consequences of signing a Form 2751 before he executed the form. He neglected to discuss this form with Batilla or get her consent before he signed it on her behalf. Additionally, even after he signed the form, Rhodes never told Batilla about consenting to the assessment. Finally, Rhodes terminated his attorney-client relationship with Batilla leaving her in ignorance of the status of her case and without taking any steps to protect her interests. These acts are sufficient to constitute negligence on the part of Rhodes. *See Montfort v. Jeter*, 567 S.W.2d 498 (Tex.1978); *Intercoastal Warehouse Corp. v. Clear Lake Nat'l Bank*, 795 S.W.2d 294, 295 (Tex.App.— Houston [14th Dist.] 1990, writ dism'd w.o.j.); *Southwestern Bell Tel. Co. v. Vidrine*, 610 S.W.2d 803, 805 (Tex.Civ.App.— Houston [1st Dist.] 1980, writ ref'd n.r.e.); Beck, *Legal Malpractice in Texas*, 43A BAYLOR L.REV. 1, 21, 51 (1991) (citing *Smith v. Lewis*, 13 Cal.3d 349, 118 Cal.Rptr. 621, 627, 530 P.2d 589, 595 (1975)). We overrule appellant's points of error one and two.

■ In point of error three, appellant contends the trial court erred in overruling his objections to the jury charge because it did not contain the controlling questions or instructions necessary to support a recovery for Batilla. Appellant attempts to add questions which Batilla should have asked the jury in order to be entitled to a recovery. He relies heavily on the issues set out in *Cosgrove v. Grimes*, which, unlike this case, was an attorney malpractice case brought by a plaintiff whose lawsuit had not been properly prosecuted.

The Texas Supreme Court in *Cosgrove* stated that "[a]n attorney malpractice action in Texas is based on negligence." *Cosgrove v. Grimes*, 774 S.W.2d 662, 664 (Tex. 1989). There are four elements which must be established by the plaintiff in a negligence action: 1) "that there is a duty owed to [her] by the defendant," 2) "a breach of that duty," 3) "that the breach proximately caused the plaintiff injury" and 4) "that damages occurred." *Id.* at 665 (citing *McKinley v. Stripling*, 763 S.W.2d 407 (Tex.1989)).

Under Texas' broad form submission rule, the definitions, instructions, and questions submitted to the jury in this case satisfy the four elements of negligence. *See* TEX.R.CIV.P. 277. The jury found Rhodes to be negligent and that his negligent conduct proximately caused Batilla $125,500 in actual damages. The jury further found Rhodes to be grossly negligent and awarded Batilla $125,000 in exemplary damages.

There was no need for additional questions tieing the issues to the "proper prosecution of the suit," as appellant contends. The Court in *Cosgrove* stated the damages issues in that case should have been asked in terms of "what would the plaintiff's damages have been if the suit had been properly prosecuted?" In this case, Batilla did not suffer damages because of Rhodes' failure to properly prosecute the case, instead she incurred damages because of his failure to defend the case, his advice on getting a "paper divorce," and his secretly consenting to the assessment of the tax against her. Thus, her damages questions were properly tied to the underlying case by determining "what damages Batilla incurred as a result of Rhodes' negligent conduct, for example, his failure to properly defend the case." We overrule appellant's point of error three.

■ In points of error four and five, appellant complains the trial court erred in overruling his motion for directed verdict, motion for judgment non obstante veredicto and motion for new trial. He alleges the evidence was legally and factually insufficient to establish that a different result would have been obtained with the IRS "but for" his acts or omissions, and that he proximately caused Batilla damage.

Appellant's allegation that the evidence is legally insufficient is a "no evidence" complaint. In reviewing a no evidence complaint we must consider only the evidence and inferences which tend to support

the jury's findings, and disregard all contrary evidence and inferences. *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671 (Tex.1990). After such a review, if we find any evidence of probative force to support these findings, then the findings must be upheld. *Responsive Terminal Sys., Inc. v. Boy Scouts of Am.*, 774 S.W.2d 666, 668 (Tex.1989). *See Southern States Transp., Inc. v. State*, 774 S.W.2d 639, 640 (Tex.1989). When there is a challenge to the factual sufficiency of the evidence, we must review all of the evidence and determine if the weight of the record supports the jury's findings that Rhodes' negligence proximately caused Batilla damages. *Plas–Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *In re King's Estate*, 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951). The jury is the sole judge of the credibility of the witnesses and the evidence, and is entitled to resolve any conflicts or inconsistencies in the evidence. *See Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792 (1951); *M.J. Sheridan & Son Co. v. Seminole Pipeline Co.*, 731 S.W.2d 620 (Tex.App.—Houston [1st Dist.] 1987, no writ).

Based on the facts and evidence already discussed in this opinion, there is ample evidence, both legally and factually, to support the jury's finding that Rhodes' negligent conduct caused Batilla damage. We overrule appellant's points of error four and five.

■ In point of error six, appellant complains the trial court erred in rendering judgment for Batilla because she had not exhausted her administrative or judicial remedies prior to bringing this action. Appellant cites the United States Supreme Court describing the doctrine of exhaustion of administrative remedies as "the long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938).

■ Although we agree with appellant's definition of the exhaustion of remedies doctrine, we cannot agree that the doctrine bars Batilla from prosecuting this suit. The United States Supreme Court has generally treated the exhaustion of remedies doctrine "as a jurisprudential doctrine [which does not bar absolutely a court's jurisdiction to hear a case,] and has evaluat[ed] the specific circumstances of the particular case to determine whether the [doctrine] should be applied." *I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton TRI Indus.*, 727 F.2d 1204, 1208 (D.C.Cir. 1984) (citing *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969)). As a general rule, the exhaustion of remedies doctrine is utilized to prevent a plaintiff from litigating an issue in court which should have first been considered by an administrative agency. *See, e.g., Weinberger v. Salfi*, 422 U.S. 749, 766, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975); *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969); *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938); *Gulf Oil Corp. v. United States Dep't of Energy*, 663 F.2d 296 (D.C.Cir.1981). We know of no administrative agency within the IRS or elsewhere which should have considered Batilla's malpractice claim prior to her filing suit in the trial court.

Further, there was no requirement that Batilla appeal the final assessment by the IRS in order to establish the open and obvious malpractice committed by appellant. We overrule appellant's point of error six.

■ In points of error seven and eight, appellant contends the trial court erred in its submission of his case to the jury. He argues submitting the case under the standard applicable to a "tax attorney" is improper because to do so suggests his conduct should be reviewed differently than that of "the reasonably prudent attorney." Additionally, appellant alleges the instructions to the jury describing Batilla as a "layman" and him as a "tax attorney" emphasized Batilla's contentions and amounted to an improper comment on the weight

of the evidence, resulting in reversible error.

■ As a general rule the standard of care for an attorney being sued for malpractice is set out as follows:

A lawyer in Texas is held to the standard of care which would be exercised by a reasonably prudent attorney, based on the information the attorney has at the time of the alleged act of negligence. *Cosgrove*, 774 S.W.2d at 664; *Dyer v. Shafer, Gilliland, Davis, McCollum & Ashley, Inc.*, 779 S.W.2d 474, 477 (Tex.App.—El Paso 1989, writ denied). In other areas of professional malpractice, such as medical malpractice, a practitioner "who holds himself out as a specialist is generally expected to possess a higher degree of skill and learning than a general practitioner." *King v. Flamm*, 442 S.W.2d 679, 681 (Tex. 1969). Other jurisdictions have applied this standard to attorneys and have held that an attorney who holds himself out as a specialist or expert in a field is held to the standard of the reasonably prudent expert attorney in that field. *See Rodriguez v. Horton*, 95 N.M. 356, 359, 622 P.2d 261, 264 (App.1980); *Wright v. Williams*, 47 Cal.App.3d 802, 121 Cal.Rptr. 194 (Ct.App. 1975). *See also* Beck, *Legal Malpractice in Texas*, 43A BAYLOR L.REV. 1, 70 (1991) (citing *Smith v. Lewis*, 13 Cal.3d 349, 118 Cal.Rptr. 621, 627, 530 P.2d 589, 595 (1975)).

We see no reason why this standard of care for one who holds himself out as an expert or specialist should not apply to appellant. According to his own testimony, appellant is a "tax expert." Batilla testified he held himself out to her as a tax specialist who was familiar with 100% penalty cases, and that he would have no troubling taking care of her case. Thus, appellant was properly held to the standard of care which would be exercised by a reasonably prudent tax attorney.

■ As to the jury instructions which described appellant as a "tax attorney," and Batilla as a "layman," we find no abuse of discretion in the trial court's use of these terms. We agree with appellant that in most legal malpractice cases the plaintiff will be a layperson. However, the fact of the matter is appellant held himself out as a tax attorney, and Batilla was a layman. We do not find the use of these terms to be an improper comment on the weight of the evidence. We overrule appellant's points of error seven and eight.

■ In points of error nine, ten, and eleven, appellant complains the trial court erred in awarding $125,000 in exemplary damages. He alleges the amount of exemplary damages found by the jury is excessive and there is insufficient evidence of his "net worth" on which to base the award. Appellant also contends there is no evidence or insufficient evidence of "gross negligence" upon which to base the award of exemplary damages.

■ The factors to consider when reviewing exemplary damages are set out in *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908 (Tex.1981). These five factors "are (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety." *Id.* Further, the amount of exemplary damages awarded must be reasonably proportioned to the amount of actual damages awarded. *Id.* at 910.

Based on the facts discussed earlier in this opinion, we find the nature of the wrong, the character of appellant's conduct, the degree of culpability of appellant, the situation and sensibilities of appellant and Batilla, and the extent to which appellant's conduct offends the public sense of justice and propriety sufficient to support this award of exemplary damages. Additionally, the amount of exemplary damages awarded was $125,000 and the amount of actual damages awarded was $125,500, a ratio of approximately one to one. The award of exemplary damages was not excessive in this case.

■ As to appellant's complaint of factually insufficient evidence to show his net worth, we will review all of the evidence and determine if the weight of the record

supports the jury's award of exemplary damages based upon the evidence of his net worth. *See Plas–Tex, Inc.*, 772 S.W.2d at 445.

Batilla entered into evidence a two page listing of real property held in the name of Christopher Rhodes, either individually, or jointly with other persons, including an office building, rental property, and personal residences. Appellant testified about rental property, from which he received income. He also testified he owned acreage, office furniture and equipment, accounts receivables, three boats, vehicles, residential furnishings, and guns and other sporting equipment. Further, he testified, that in his opinion, none of these items had much value and that his law practice had zero value.

The jury was free to believe or disbelieve appellant's opinion as to the value of his assets. *See Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792 (1951); *M.J. Sheridan & Son Co. v. Seminole Pipeline Co.*, 731 S.W.2d 620 (Tex.App.—Houston [1st Dist.] 1987, no writ). Based on a review of all of the evidence, there is sufficient evidence of appellant's net worth for the jury to have awarded $125,000 in exemplary damages.

■ Finally, we address appellant's complaint of no evidence or factually insufficient evidence to establish his "gross negligence." The standards of review for no evidence and factually insufficient evidence are set out above under points of error four and five.

The factor which "lifts ordinary negligence into *gross* negligence is the mental attitude of the defendant. . . ." *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 922 (Tex.1981). In order for appellant to be found grossly negligent, Batilla must have shown "that [he] was consciously, i.e., knowingly, indifferent to h[er] rights, welfare and safety." *Id.* Appellant's conduct can be either active or passive in nature, which means a finding of gross negligence can be based on either his acts or omissions. *Id.*

The record is replete with evidence sufficient to support the jury's finding of gross negligence on the part of appellant. His

conscious indifference in investigating and presenting facts to the IRS, in failing to return phone calls from the IRS, in failing to investigate or correct the false and misleading information he sent to the IRS, in failing to research or present any facts, affidavits, or legal authority favorable to his client in his meeting with the IRS, in failing to recognize the effects of signing the Form 2751 before signing it, in signing the form agreeing to the assessment of the tax against his client in direct contravention to the purpose for which he had been retained, in doing so without his client's knowledge or consent, and in terminating his relationship with his client without even informing her of the status of her case, are sufficient to support a finding of gross negligence on appellant's part. We overrule appellant's points of error nine, ten, and eleven.

■ In point of error twelve, appellant complains the trial court erred in entering judgment for "emotional distress" damages because the award is excessive and should not have been submitted in the absence of extraordinary or egregious circumstances.

■ In certain circumstances the award of emotional distress damages in a legal malpractice case is appropriate. *See Cosgrove v. Grimes*, 774 S.W.2d 662 (Tex. 1989); *Heath v. Herron*, 732 S.W.2d 748 (Tex.App.—Houston [14th Dist.] 1987, writ denied). We believe the facts of this case meet the test of extraordinary or egregious circumstances.

Batilla testified she suffered severe emotional distress relating to the mishandling of her tax defense, the dissolution of her marriage, and the negative affect on her credit by the Federal Tax Lien filed after the tax assessment was agreed to by appellant. She testified about her inability to deal with relationships, both personal and professional, about her weight loss, her inability to sleep, spastic stomach, sporadic colon ulcers, fear, and nervousness. Batilla told the jury about her loss of credit, the destruction of her banking relationships, the emotional trauma of her divorce and

the accompanying property loss, and the pain of trying to help her son understand the divorce and where his father had gone. Other witnesses also testified about Batilla's severe weight loss, nervousness and inability to function. We do not find the award of damages for emotional distress to be improper or excessive. We overrule appellant's point of error twelve.

In point of error thirteen, appellant complains the trial court erred in not submitting his requested instruction on "new and independent cause" to the jury. Appellant contends Batilla's new attorney, Stevens, was the source of this new and independent cause. He alleges that Stevens represented Batilla from April 1988 until the time of trial in August 1991. During this time period appellant argues Stevens led Batilla to believe she owed the IRS $32,124.31 when in reality the debt was already paid in full.

A "new and independent cause" is a separate or independent act that destroys the causal connection between a defendant's negligence and a plaintiff's injury, thereby becoming the immediate cause of such injury. *Tarry Warehouse & Storage Co. v. Duvall*, 131 Tex. 466, 115 S.W.2d 401, 405 (1938); *Allied Bank West Loop, N.A. v. C.B.D. & Assocs., Inc.*, 728 S.W.2d 49, 55 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). In order for a trial court to submit an instruction on new and independent cause, "[t]here must be some evidence that the independent act, rather than the defendant's negligence, was responsible for the plaintiff's injury." *Allied Bank West Loop, N.A.*, 728 S.W.2d at 55 (citing *Goldstein Hat Mfg. Co. v. Cowen*, 136 S.W.2d 867, 873 (Tex.Civ.App.—Dallas 1939, writ dism'd judgmt cor.)). Additionally, a trial court does not err in refusing a new and independent cause instruction "where the act alleged to be a new and independent cause is dependent on the defendant's negligent act." *Id.* (citing *McAllen Kentucky Fried Chicken No. 1, Inc. v. Leal*, 627 S.W.2d 480, 483 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.)).

There is no evidence to support appellant's contention that Stevens represented Batilla from April 1988 until August 1991. Both Batilla and Stevens testified that Stevens represented her for a period of approximately three or four months, from April 1988 until July 1988. Stevens further testified his only subsequent contact with Batilla had been through his involvement in this lawsuit as an expert witness. When Stevens first represented Batilla, the tax debt had already been assessed against her on February 15, 1988 due to appellant's execution of the Form 2751. Although Batilla was unaware that appellant had agreed to the IRS' claim, she was aware the IRS was going to execute on her property to collect on the debt. Once he was retained on the case, Stevens got the collection activities against Batilla stopped, and worked out an installment plan with the IRS for payment of the tax debt.

Further, there is no evidence to support appellant's contention that the tax debt was paid off for the period from April 1988 to August 1991, and certainly no evidence to support his contention that the debt was paid off during the period of Stevens' representation. The record is devoid of evidence establishing when the majority of the tax debt was paid or who paid it off. The only evidence in the record is Batilla's testimony that on August 12, 1991 she paid the final $69 owing on the account in order to zero out the balance. This pay-off of the remaining debt was subsequent to the period of Stevens' representation. During the period of Stevens' representation, the collection efforts by the IRS were ongoing, and Batilla was still receiving phone calls from Amdexter regarding the tax debt. Even after Stevens' representation had ceased, there is evidence that the debt was still owing since the IRS sent Batilla a letter dated October 10, 1988, notifying her they were seizing $664.01 of her 1987 tax refund to be applied to the ROF tax debt. Additionally, there was evidence that, pursuant to the Form 2751 signed by appellant, the IRS filed a Federal Tax Lien against Batilla which was outstanding for the period from May 2, 1988 until August 1991. This tax lien adversely affected her

credit and contributed to her mental and emotional distress. We find no evidence to support the submission of a new and independent cause instruction to the jury. Appellant's point of error thirteen is overruled.

In points of error fourteen and fifteen, appellant complains about the admission and exclusion of certain evidence regarding Batilla's divorce. He alleges the trial court erred in excluding Batilla's divorce papers which were put in issue by her testimony, and claims this exclusion of evidence resulted in harmful error. Additionally, appellant contends the trial court erred by allowing Batilla to claim an attorney-client privilege regarding advice from her divorce attorney, while at the same time allowing her to testify about the reasons for, and affects of, her divorce.

■ The divorce papers appellant is complaining about are Batilla's petition for divorce, a motion for temporary restraining order and temporary orders as to custody and support of Batilla's son, and a motion for enforcement and clarification filed by Batilla's husband approximately a year after the divorce. Appellant is precluded from complaining on appeal about the motion for enforcement and clarification because he never offered it to the trial court for admission into evidence.

■ As to the other two documents, appellant attempted to offer them into evidence during his cross-examination of Batilla. At trial, Batilla testified she got a divorce because of Rhodes' advice to protect her family from the IRS's collection efforts. The trial court admitted Batilla's divorce decree as evidence that she[6] did indeed get a divorce. Although the trial court refused to allow either the divorce petition or the motion for temporary restraining order into evidence, it did allow appellant to question Batilla extensively regarding these documents. The trial court did not abuse its discretion in refusing to admit these two documents into evidence as they were cumulative of the evidence elicited in appellant's cross-examination of Batilla. *See Mottu v. Navistar Int'l Transp. Corp.*, 804 S.W.2d 144, 147 (Tex.

App.—Houston [14th Dist.] 1990, writ denied).

Appellant was allowed to establish that the petition alleged the grounds for divorce were cruel treatment by her husband, and that her divorce attorney talked to her about the divorce in order to draft and file the petition. Appellant was also able to establish that the petition indicated she needed protection from her husband, and that she got a temporary restraining order entered protecting her from her husband. Finally, he was able to establish that she knew these papers had to be, and were, filed in order to get a divorce, although she alleged she had not seen these documents and was not aware of their contents. This is exactly the relevant information appellant claims in his brief the jury could have gotten from having the documents entered into evidence. Thus, error, if any, was harmless. Tex.R.App.P. 81(b)(1).

■ Appellant also complains the trial court erred by allowing Batilla to claim an attorney-client privilege regarding any advice given by her divorce attorney. Generally, attorney-client communications are protected from discovery by the attorney-client privilege. Tex.R.Civ.Evid. 503; Tex. R.Civ.P. 166b(3). Batilla did not put in issue any advice given her by her divorce attorney. Additionally, appellant was allowed to extensively attack Batilla's credibility regarding her divorce on cross-examination without delving into privileged matters. *See* Tex.R.App.P. 81(b)(1). Thus, the trial court did not abuse its discretion by allowing Batilla to assert the attorney-client privilege as to communications with her divorce attorney. We overrule appellant's points of error fourteen and fifteen.

■ In points of error sixteen and seventeen, appellant complains the trial court erred in admitting Owens' testimony. He alleges that Owens was not properly identified in Batilla's answers to interrogatories. Appellant also contends Owens should not have been allowed to testify about his own separate, extraneous dealings with Batilla and the IRS.

Appellant asked in interrogatory number 10 for the identity of persons with knowledge of relevant facts and the substance of their testimony. Batilla's answer in pertinent part was "Larry Owens (Also met with Defendant)." At trial appellant objected to Owens being called as a witness because he had not been properly identified since Batilla did not provide sufficient information about him in her interrogatory answer.

Owens was identified by Batilla as a witness. His address and phone number were easily ascertained from appellant's own business records since he was one of appellant's own clients. Also, Batilla filed a number of supplemental responses to interrogatories and requests for production prior to trial, including an affidavit by Owens stating his address, phone number and the facts surrounding Batilla's employment and duties at ROF.

At trial, appellant objected to Owens' testimony on the basis it was hearsay, extraneous, and irrelevant. *See* Tex.R.Civ. Evid. 402, 802. In his brief, however, appellant also argues the trial court should have excluded this evidence under Tex. R.Civ.Evid. 403, and because Batilla did not sufficiently state in her answers to interrogatories the facts about which Owens had knowledge. Appellant never raised either objection at trial; therefore, they are not preserved for appeal.

■ According to appellant's own attorney, Batilla and Owens were co-debtors or co-defendants in the IRS's collection action on the ROF taxes. The evidence is uncontroverted they went together to the IRS to meet with Mr. Bean. Owens was an eyewitness to the entire event. Additionally, it is uncontroverted Owens and Batilla went together to the meeting with appellant. Appellant's representation of Batilla, or the inadequacy thereof, on the ROF tax debt is what this suit is all about. Thus, this evidence is not about some extraneous event, but is the crux of the cause of action for legal malpractice.

This evidence was also relevant to show the circumstances surrounding Batilla's filling out the forms Mr. Bean gave her at the meeting, and to show the circumstances surrounding Batilla's initial meeting with appellant. *See* Tex.R.Civ.Evid. 402. Further, some of the testimony complained of by appellant was offered to rebut his testimony about what information Owens and Batilla gave him at their initial meeting, and how well he used or followed up on that information.

We hold the trial court properly found the evidence was part of the res gestae and was not hearsay. *See* Tex.R.Civ.Evid. 803. Black's Law Dictionary 1173 (5th ed. 1979). We overrule appellant's points of error sixteen and seventeen.

In point of error eighteen, appellant complains that Batilla's testimony should have been excluded because she was not properly identified as a fact witness in her answers to interrogatories.

■ Appellant claims that party status does not constitute good cause for nondisclosure of a witness in answers to interrogatories. He cites us to *Smith v. Southwest Feed Yard, Ltd.*, 811 S.W.2d 717 (Tex. App.—Amarillo 1991, writ pending). The *Smith* case was reversed and remanded by the Texas Supreme Court in a published opinion dated June 24, 1992, a week before we heard this case on submission. *See Smith v. Southwest Feed Yards*, 835 S.W.2d 89 (Tex.1992). The Texas Supreme Court created a limited exception under which a party may be allowed to testify despite the fact he failed to identify himself as a witness in answers to interrogatories. *Id.* at 90–91.

The *Smith* opinion stresses that "[a] party cannot disregard procedural rules and still insist upon an *absolute* right to testify in all circumstances." *Id.* at 90 (emphasis added). However, "[t]he importance attached to a party's ability to testify in his or her own behalf [does] constitute[ ] an additional factor [which] the trial court must consider in making its good cause determination." *Id.* The Supreme Court goes on to state that "[i]n determining whether 'good cause' exists to permit his testimony, the substance of [a party's] entire response should be considered, not just

his incomplete reply to a single query." *Id.* at 91.

After a review of the facts and circumstances of this case, we find the trial court was correct in overruling appellant's objection to Batilla's testifying. This is a legal malpractice case, and the importance of Batilla being able to testify as to the circumstances of appellant's representation weighs heavily in her favor. Further, a review of her entire response to appellant's interrogatories reveals Batilla had personal knowledge of facts relevant to this lawsuit. *See id.* Batilla answered interrogatories as follows:

> 3. During meeting in Defendant's office on February 13, 1986, Defendant told me he was a tax specialist. On approximately June 28, 1986, I received a copy of a letter from Defendant to Lawrence M. Fagen of the IRS in which Defendant's letterhead reads "Board Certified Tax Attorney."
> 4. On approximately May 16, 1986, I called Defendant on the telephone and stressed that I would not be signing any forms which caused me to incur unnecessary tax liability. Despite that fact, Defendant signed Form 2751 where by I incurred unnecessary tax liability.
> 11. IRS has set up a payment schedule. Have called my home several times. The IRS withheld my 1987 tax refund and applied it to the penalty I incurred because of Defendant's actions. The IRS has filed a personal tax lien against me. The IRS has contacted my banker and informed him of the action they have against me.

These answers, and several others, in Batilla's 21 original answers to appellant's interrogatories, show that she had unique knowledge of relevant facts. We overrule appellant's point of error eighteen.

 In point of error nineteen, appellant complains the trial court erred in admitting numerous items of evidence, and in allowing two witnesses, John Mingus (Mingus) and Elsie Ford (Ford), to testify. He states he served interrogatories and requests for production on April 3, 1990, and did not receive the documents or witnesses' names until shortly before trial.

This case went to trial on August 26, 1991. On July 24, 1991, Batilla supplemented her responses to appellant's interrogatories and requests for production. In that supplement, she provided the names and addresses of both Mingus and Ford, and produced the notice from the IRS seizing her 1984 tax refund. These names, and one of documents complained of by appellant, were produced more than 30 days before trial and several days before the July 30, 1991 discovery deadline. The trial court did not err in admitting this document and the witnesses' testimony.

Appellant also complains specifically about the admission of Batilla's W-2 form, her 1985 income tax return, her decree of divorce, her letter to the IRS requesting abatement, and her loan rejection notice. He alleges he was not served with any of these documents until August 21, 1991, less than a week before trial.

 Appellant has not preserved any complaint for appeal based upon a failure to timely provide the W-2 form. In the trial court appellant did not object based on failure to timely produce, and in fact stated: "I don't believe I complained that you did not give that to me." Appellant specifically waived any objection to the production of this document and there was no error in its admission.

 Appellant never requested Batilla's personal income taxes in any request for production. Thus, she was under no duty to produce the documents. Additionally, the trial court only admitted the tax return for the limited purpose of showing that if Rhodes had used the return in representing Batilla before the IRS, it would have shown she did not receive income from ROF in 1985, was not a ROF employee for that year, and therefore, could not have been a "person responsible" for paying the taxes for that year. The trial court did not err in admitting Batilla's personal tax return.

The record contains excerpts from Batilla's oral deposition indicating that the divorce decree was produced on July 26, 1991

in response to a request for documents. This is at least thirty days before trial and is prior the July 30, 1991 discovery deadline. The trial court did not err in admitting the divorce decree into evidence.

■ The next item on the list is Batilla's letter to the IRS requesting abatement. This letter was produced on August 21, 1991, four days before trial and well after the deadline for discovery. The trial court admitted the letter only for the limited purpose of showing that Batilla did take steps to try and help herself with the IRS. There was other testimony establishing that she requested an abatement, requested affidavits from co-workers at ROF in order to prove she was not responsible for the taxes, and met with the IRS to convey this information to Amdexter. Thus, the admission of this document for the purpose of showing she had tried to help herself was cumulative of other evidence establishing that same point, and as such was harmless. *See Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989); *Richardson v. Green*, 677 S.W.2d 497, 501 (Tex. 1984). *See also* TEX.R.APP.P. 81(b)(1).

■ Finally, as to Batilla's loan rejection notice, Batilla's counsel explained to the trial court that she could not have produced the document any sooner, since it was dated August 12, 1991. She produced it to appellant's counsel within 48 hours of receipt. Determination of good cause for the admission of late produced evidence is within the sound discretion of the trial court and can only be set aside if that discretion is abused. *Morrow v. H.E.B., Inc.*, 714 S.W.2d 297, 297–98 (Tex.1986). Logic dictates that a document cannot be produced until after it is received. Batilla's counsel satisfied the duty to supplement as soon as it came into her possession. The trial court did not abuse its discretion, and we overrule appellant's point of error nineteen.

In point of error twenty, appellant contends this Court should reverse the trial court's judgment based on the cumulative effect of all errors. Having found no error, appellant's point of error twenty is overruled.

■ In point of error twenty-one, appellant complains the trial court erred in awarding pre-judgment interest to Batilla because the evidence did not establish with reasonable certainty when such interest should begin to accrue. Appellant contends the April 25, 1988 date set by the trial court from which pre-judgment interest was to accrue was not proper.

By April 25, 1988, Batilla had already paid appellant the $500 retainer fee, learned appellant had sent the IRS incorrect information, obtained her divorce, appellant had agreed to the tax assessment against her, the IRS had seized a $664 tax refund, and Batilla had retained new counsel to salvage her case with the IRS. The trial court did not err in ordering pre-judgment interest to begin accruing on April 25, 1988. We overrule point of error twenty-one.

In point of error twenty-two, appellant complains the trial court erred in allowing Batilla to include as costs of court her cost for copies of two depositions.

■ The Rules of Civil Procedure mandate that a "successful party to a suit shall recover of his adversary *all* costs incurred therein, except where otherwise provided." TEX.R.CIV.P. 131 (emphasis added). Additionally, the trial court has the discretion to allocate costs in response to motions by the parties. TEX.R.CIV.P. 133. The rules also provide that "[n]o fee for a copy of a paper not required by law or these rules shall be taxed in the bill of costs." TEX.R.CIV.P. 140. Appellant has failed to show that the deposition copy was not a cost incurred under rule 131, and thus, required to be paid by the losing party. We overrule appellant's point of error twenty-two.

The judgment of the trial court is affirmed.