Thomas Lamar BEAN, Petitioner,

v.

UNITED STATES of America, Bureau
of Alcohol, Tobacco and Firearms,
Respondents.

No. CIV. A. 1:99–CV–724.

United States District Court,
E.D. Texas,
Beaumont Division.

Feb. 22, 2000.

Larry C. Hunter, Vidor, TX, for Petitioner.

John Burch Stevens, Jr., Asst. U.S. Atty., U.S. Attorney's Office, Beaumont, TX, for Respondents.

## MEMORANDUM OPINION

JOE J. FISHER, District Judge.

Before the Court is the Petitioner's "Petition for Relief from Disabilities Under the Federal Firearms Act." After considering the Petition, the evidence submitted, the Response from the Respondents, and arguments from counsel, the Court GRANTS the Petition. A separate Order will be entered in accordance with this Memorandum.

## I. BACKGROUND

On Saturday, March 14, 1998, Mr. Thomas Lamar Bean ("Petitioner," "Mr. Bean," or "Bean") was attending a gun show as a dealer in Laredo, Texas. At the conclusion of the show, Mr. Bean and his three assistants decided to cross the United States–Mexican border to have dinner at a restaurant in Nuevo Laredo, Mexico. Before leaving, Mr. Bean instructed his assistants to remove all firearms and ammunition from his 1994 Suburban. However, as the assistants removed said items from the vehicle, they inadvertently left approximately two hundred rounds of ammunition in plain view in the back of Mr. Bean's Suburban.

Mr. Bean's vehicle was stopped at the Mexican Port of Entry, Nuevo Laredo, Tamaulipas, Mexico, where the ammunition was discovered by Mexican officials. Although all four individuals were initially arrested, Mr. Bean's associates were soon released. Bean, however, was detained and charged with introduction of ammunition into the Republic of Mexico since he was the owner of the vehicle and the ammunition. While acknowledging that the ammunition was in plain view in the back of his Suburban, Bean stated that he was unaware that the ammunition was in the vehicle at the time he crossed the border. He was also unaware that possession of ammunition was an offense in the Republic of Mexico.

Mr. Bean was immediately taken into custody and almost two months later, on May 27, 1998, was sentenced to a term of imprisonment of five years and was fined in the amount of 17,679 pesos or the equivalent of twenty days of community service work. He remained in a Mexican jail until September 21, 1998, when he was transferred to the La Tuna Penitentiary in Anthony, Texas by virtue of the International Prisoner Transfer Treaty and the applicable federal statutes under 18 U.S.C. § 4100, *et seq.*

Bean was then released from La Tuna Penitentiary on October 21, 1998 and returned to his home in Orange County, Texas. Pursuant to 18 U.S.C. § 4106A(b)(3), jurisdiction over the Petitioner was conferred upon the United States District Court for the Eastern District of Texas. Petitioner was initially placed on supervised release but this restriction was terminated by an order signed by this Court on August 30, 1999.

Due to this Mexican conviction (and despite the termination of supervised release), Mr. Bean could not own or possess a firearm. Title 18 U.S.C. § 922(g)(1) prohibits any person "who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year" from shipping, transporting, or pos-

sessing any firearms or ammunition. However, 18 U.S.C. § 925(c) permits any person to apply to the Secretary of Treasury for relief from the disabilities imposed under § 922(g)(1). The Secretary of Treasury is authorized to restore firearm privileges to the applicant "if it is established to [the Secretary's] satisfaction that the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. § 925(c). The Secretary of the Treasury has delegated his authority to grant relief to the Director of the Bureau of Alcohol, Tobacco and Firearms ("BATF" or "ATF"). *See* 27 C.F.R. § 178.144.

Title 18 U.S.C. § 925(c) also states that "any person whose application for relief from disabilities is denied by the Secretary may file a petition with the United States district court ... for a judicial review of such denial. The court may in its discretion admit additional evidence where failure to do so would result in a miscarriage of justice...." 18 U.S.C. § 925(c).

Congress however, in 1992, enacted the Treasury, Postal Service, and General Government Appropriations Act (the "Appropriations Act"), mandating that "none of the funds appropriated herein shall be available to investigate or act upon applications for relief from Federal firearms disabilities under 18 U.S.C. § 925(c)."[1] Since then, Congress has imposed similar funding limitations for each fiscal year.[2] This essentially meant that the ATF could no longer conduct investigations because they had been given no appropriations to do so.

On July 14, 1999, counsel for Mr. Bean wrote the Bureau of Alcohol, Tobacco and Firearms requesting the relief authorized by § 925(c). The ATF replied and informed Bean that the agency is not accepting applications for restoration of firearms privileges since Congress has specifically denied funding for ATF investigations, or actions on applications for § 925(c) relief, through a series of appropriations measures dating back to October 1992. Mr. Bean was instructed by the ATF to contact their office if and when Congress lifts the restrictions. Bean then filed in this Court his "Petition for Relief of Disabilities Under the Federal Firearms Act."

## II. ANALYSIS

Bean's petition presents four questions for this Court: (1) whether the decision by Congress not to fund the review of applications for relief submitted to the ATF suspends the relief available provided for under 18 U.S.C. § 925(c); (2) whether the inaction by the ATF constitutes a defacto denial of an application such that a United States district court may consider a petition for judicial review of the denial; (3) whether a foreign conviction may serve as the predicate offense for a prohibition of firearms privileges under 18 U.S.C. § 922(g)(1); and (4) whether Mr. Bean will be "likely to act in a manner dangerous to public safety" and if the "granting of the relief would ... be contrary to the public interest." 18 U.S.C. § 925(c).

1. *See* Treasury, Postal Service, and General Government Appropriations Act, 1993, Pub.L. No. 102–393, 106 Stat. 1729, 1732 (1992).

2. *See* Treasury, Postal Service, and General Government Appropriations Act, 2000, Pub.L. No. 106–58, 113 Stat. 430 (1999); Treasury, Postal Service, and General Government Appropriations Act, 1999, Pub.L. No. 105–277, 112 Stat. 2681 (1998); Treasury, Postal Service, and General Government Appropriations Act, 1998, Pub.L. No. 105–61, 111 Stat. 1272, 1277 (1997); Treasury, Postal Service, and General Government Appropriations Act, 1997, Pub.L. No. 104–208, 110 Stat. 3009, 3009–319 (1996); Treasury, Postal Service, and General Government Appropriations Act, 1996, Pub.L. No. 104–52, 109 Stat. 468, 471 (1995); Treasury, Postal Service, and General Government Appropriations Act, 1995, Pub.L. No. 103–329, 108 Stat. 2382, 2385 (1994); Treasury, Postal Service, and General Government Appropriations Act, 1994, Pub.L. No. 103–123, 107 Stat. 1226, 1228 (1993).

**A. Congress' failure to fund the review of applications by the ATF was not a suspension of *relief* under 18 U.S.C. § 925(c), but rather Congress only intended the suspension of the ATF's ability to investigate or act upon applications for relief by individuals.**

 This Court does not question that it is Congress' exclusive power to appropriate money and establish the jurisdiction of inferior federal courts. *See* U.S. Const., Art. I, § 8; U.S. Const., Art III, § 1. The Court also recognizes that Congress may also use appropriation acts to amend or repeal substantive legislation. *See Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 440, 112 S.Ct. 1407, 1414, 118 L.Ed.2d 73 (1992); *United States v. Dickerson*, 310 U.S. 554, 555, 60 S.Ct. 1034, 1035, 84 L.Ed. 1356 (1940); *Director, OWCP v. Alabama by Products Corp.*, 560 F.2d 710, 719 (5th Cir.1977).

 Nevertheless, it is a general maxim that repeals by implication are "strongly" disfavored. *See Johnson v. Robison*, 415 U.S. 361, 373–74, 94 S.Ct. 1160, 1168–69, 39 L.Ed.2d 389 (1974). Before courts will hold that Congress has used an appropriation act to repeal substantive legislation or preclude judicial review of administrative action, the intention to do so must be clearly stated. *See Robertson*, 503 U.S. at 440, 112 S.Ct. at 1414 (Congress "may amend substantive law in an appropriations statute, as long as it does so clearly."); *Johnson v. Robison*, 415 U.S. 361, 373–74, 94 S.Ct. 1160, 1168–69, 39 L.Ed.2d 389 (1974) (courts require "clear and convincing evidence of congressional intent ... before a statute will be construed to restrict access to judicial review").

Ultimately, this Court is relegated to determining Congress' intent, with respect to 18 U.S.C. § 925(c), when it suspended funds for the ATF to conduct investigations and whether such intent was "clear." The Court begins this analysis by discussing a similar case from the Third Circuit Court of Appeals, *Rice v. U.S., Depart-ment of Alcohol, Tobacco and Firearms*, 68 F.3d 702 (3d. Cir.1995).

In 1970, Phillip Rice ("Rice") pleaded guilty in state court to several felonies involving stolen auto parts. *Id.* at 704. More than twenty years later, Rice submitted an application to the ATF for restoration of his firearm privileges. *Id.* at 705. In response, the ATF sent Mr. Rice a letter notifying him that it could no longer process his application because Congress had passed an appropriation bill which suspended funds for the ATF to investigate or act upon such applications. *Id.* Mr. Rice, pursuant to the express language in 18 U.S.C. § 925(c), then filed a petition for judicial review in federal district court. *Id.* at 705.

Concerning the question of legislative intent, the Court found that the Appropriation Acts failed "to show a clear intent to repeal section 925(c) or to preclude judicial review of (the) BATF's refusal to grant relief from firearms disabilities." *Id.* at 707. In making the determination, the Court looked at the language contained in the 1993 Appropriations Act and found it extremely important that the Appropriations Acts did not "expressly preclude a court from reviewing BATF's refusal to process an application for relief." *Id.* Subsequently, the Court held that the Appropriations Acts neither repealed 18 U.S.C. § 925(c) nor precluded "judicial review of administrative decisions concerning a convict's application for restoration of his firearm privileges." *Id.*

The Fifth Circuit Court of Appeals has also considered this issue in *United States v. McGill*, 74 F.3d 64 (5th Cir.1996). McGill, who had previously pleaded guilty to two felony offenses, wrote the ATF requesting information about applying for relief from his 18 U.S.C. § 922(g)(1) disability. The ATF informed McGill that it was no longer accepting applications due to the appropriations measures. Like Rice, McGill then filed an application with the district court for the removal of his disabilities. However, the district court

promptly dismissed McGill's application. *Id.* at 65–66.

In affirming the lower court, the Fifth Circuit quickly determined that the controlling question was Congress' intent as it suspended funds for the ATF to conduct investigations. The Court first quoted the language of Section 925(c) and noted that the ATF has authority to act on these applications. It then considered the legislative history of some of the applicable appropriations measures in light of the government's argument that relief had been suspended. *Id.* at 67. The Court noted that the Appropriations Committee expressed concern over: (1) the use of limited resources for investigating these cases; and (2) the consequences to innocent citizens if BATF makes a mistake in granting relief to a felon from his firearm disabilities.[3] The court based its decision on the circumstances and the explanation by the Appropriations Committee and stated:

> "[I]t is clear … that Congress intended to suspend the relief provided by § 925(c). We cannot conceive that Congress intended to transfer the burden and responsibility of investigating the applicant's fitness to possess firearms from the [B]ATF to the federal courts, which do not have the manpower or expertise to investigate or evaluate these applications." *Id.* at 67.

**3.** For example, House Report No. 102–618 states:

> "Under current law, a person convicted of a crime punishable by imprisonment for a term exceeding one year may not lawfully possess, receive, ship, or transport firearms…. [BATF] may grant relief from these disabilities where it is determined that the applicant for relief will not be likely to act in a manner dangerous to public safety and that the granting of relief would not be contrary to the public interest."
>
> "Under the relief procedure, [B]ATF officials are required to guess whether a convicted felon or person committed to a mental institution can be entrusted with a firearm. After [B]ATF agents spend many hours investigating a particular applicant for relief, there is no way to know with any certainty whether

Thus, the court concluded that relief from federal firearms disabilities under Section 925(c) had been "clearly" suspended by the Appropriations Acts. Subsequently, the Fifth Circuit affirmed the district court's dismissal of the Plaintiff's petition for review. *Id.* at 68.

### 1. This Court's Analysis of all relevant legislative history.

This Court has diligently searched the legislative history of both 18 U.S.C. § 925(c) and the Appropriations Acts. In doing so, the Court has found many contradictory statements by Congressmen regarding these provisions. This Court has concluded that in looking at the legislative history as a whole, it does not reach the level of "clarity" needed to suspend the type of relief which is expressly provided for in the statute. *See* 18 U.S.C. § 925(c).

Individuals with convictions which are punishable by more than one year have long been prohibited from owning a firearm. Until 1965, there were no exceptions to this rule. However, beginning with the original relief provision in 1965, Congress believed the strict application of the Federal Firearms Act worked to the disadvantage of some individuals who posed no danger to the public by reason of firearm possession. *See* H.R.Rep. No. 89–708, at 1 (1965). The committee expressed concern that "[n]o consideration can be given to

the applicant is still a danger to public safety. Needless to say, it is a very difficult task. Thus, officials are now forced to make these decisions knowing that a mistake could have devastating consequences for innocent citizens."

> "Thus, the Committee believes that the $3.75 million and the 40 man-years annually spent investigating and acting upon these applications for relief would be better utilized by [B]ATF in fighting violent crime. Therefore, the Committee has included language which states that no appropriated funds be used to investigate or act upon applications for relief from Federal firearms disabilities."

H.R.Rep. No. 102–618, at 13–14 (1992); see also S.Rep. No. 103–106, at 20 (1993) (same); S.Rep. No. 102–353, at 19–20 (1992) (same).

any circumstances which might cause a judge to properly mitigate or even suspend the punishment. Nor may consideration be given to the fact that the crime might be wholly unrelated to firearms and to the disability imposed by the Federal Firearms Act." *Id.*

Thereafter, Congress amended the Federal Firearms Act by providing a relief provision. *See* U.S.C. § 910 (Supp. II 1965) (repealed 1968). However, instead of having the courts make the determination with regards to relief to particular individuals and corporations, Congress empowered the Secretary of the Treasury with the task. *Id.* The relief provision provided the Secretary with a broad and subjective standard for either granting or denying relief. *Id.*

In 1986, Congress amended the relief provision and expressly provided for judicial review of relief denials by the ATF. *See* Firearms Owners' Protection Act, Pub.L. No. 99–308, § 1, 100 Stat. 449 (1986) (current version at 18 U.S.C. §§ 921–930 (1994)). In regards to the change, the Judiciary Committee reported that "(t)his section reforms the provisions of 18 U.S.C. § 925(c) to *improve the ability of the deserving members of the public to obtain relief from the legal disqualification from firearms ownership.*" *See* H.R.Rep. No. 99–495, at 1 (1986) (emphasis added). Also, a Senate Report in 1984 explained that the legislation "is intended to provide a 'safety valve' whereby persons whose offenses were technical and nonviolent, or who have subsequently demonstrated their trustworthiness" may obtain relief. *See* S.Rep. No. 98–583, at 26 (1984). Adding judicial review to the existing legislation was intended to afford individuals not inclined to engage in criminal activity the "essential" opportunity to demonstrate trustworthy character.[4]

This history seems to establish three things: (1) Congress realized that not all persons convicted of felonies should be denied firearms privileges forever; (2) Congress provided the ATF with the ability to reinstate firearms privileges; and (3) Congress intended the judiciary to give the final word on the appropriateness of a denial by the ATF. *See generally* Ronald C. Griffin, *Obtaining Relief from Federal Firearms Disabilities: Did Congress Really Suspend the Relief Available to Felons Through Appropriations Acts?*, 23 Okla. City U.L.Rev. 977 (1998).

Since 1993, the funding cuts have not allowed the ATF to conduct investigations with regard to relief applications. The McGill Court used the following Senate Report as conclusive evidence that Congress intended to suspend 18 U.S.C. § 925(c):

> "(u)nder the relief procedure, (B)ATF officials are required to determine whether a convicted felon, including persons convicted of violent felonies or serious drug offenses, can be entrusted with a firearm. After (B)ATF agents spend many hours investigating a particular applicant(,) they must determine whether or not that applicant is still a danger to public safety. This is a very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision is made. The Committee believes that the approximately 40 man-years spent annually to investigate and act upon these investigations and applications would be better utilized to crack down on violent crime."

*McGill*, 74 F.3d at 67 (quoting S.Rep. No. 102–353, at 19 (1992)).

However, the McGill Court used the above statement without reviewing any congressional hearings that were the basis

---

4. *See* S.Rep. No. 98–583, at 26 (1984). In this Senate Report, the Senate Committee on the Judiciary worried that lack of review by the ATF and the judiciary "could arbitrarily exclude from relief persons who might other-

wise be more trustworthy than those eligible, particularly if they have been convicted of technical or unintentional violations.... [M]aking relief available to such persons is essential." *Id.* (emphasis added).

for the statement found in the Senate Report. The transcript of a Senate subcommittee hearing provides insight as to the true reason for the funding cuts. Here, the Director of the ATF responded to questions pertaining to the relief provisions. *See* Treasury, Postal Service, and General Government Appropriations for Fiscal Year 1993: Hearings on H.R. 5488 Before the Subcomm. of the Senate Comm. on Appropriations, 102d Cong. 69 (1993).

The Director testified that although "every year about 3,000 to 4,000 people express an interest in (applying for relief)," only 1,000 applications (approximately) are found eligible to be acted upon. *Id.* However, the ATF had requested $3.7 million to fund the relief from disabilities program for the 1993 fiscal year. *Id.* According to these numbers, the ATF was spending an average of $3,700 per investigation.

The only "intent" that can be understood from these reports is that Congress was concerned with the with the ATF's inefficient and wasteful administrative review process rather than a desire to curb the availability of relief itself. It is true that Congress can suspend a statute through the use of appropriations acts if it does so "clearly." It is also true that Congress has modified the relief provision found in 18 U.S.C. § 925(c) several times. However, each time Congress has amended § 925(c), it has done so with a concern toward those persons who possess guns in a lawful manner but are denied possession of firearms because of unrelated felony convictions. Given the genuine concern that Congress has expressed pertaining to the "essential" right of individuals to be given the opportunity to demonstrate trustworthy character, it is consistent to infer that Congress withheld funding to the ATF for *economic reasons,* not because they intended outright suspension of relief for worthy individuals. If Congress "intended" to change anything, it deleted

administrative action from the statute, but otherwise left judicial relief available.

Furthermore, the argument that Congress intended to absolutely suspend relief to convicted persons ignores the multitude of ways under 18 U.S.C. § 921(a)(20) that a state felon may obtain restoration of his federal firearm rights by operation of state law and without the involvement of any special ATF competency. Section 921(a)(20) provides that "[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction...." 18 U.S.C. § 921(a)(20). The law of the convicting jurisdiction defines pardons, expungements, and restorations of civil rights. *See Caron v. United States,* 524 U.S. 308, 118 S.Ct. 2007, 2011, 141 L.Ed.2d 303 (1998) (citing *Beecham v. United States,* 511 U.S. 368, 371, 114 S.Ct. 1669, 128 L.Ed.2d 383 (1994)). Thus, under § 921(a)(20), a state can restore the civil rights of a person convicted of a felony in that state such that his federal firearm disability is removed.[5] *McGrath v. United States,* 60 F.3d 1005, 1008 (2d Cir.1995) recognized that "many states restore civil rights to convicted felons by means of a general law stating that all rights shall be reinstated upon the service of a sentence." Other states authorize officials to issue certificates of restoration after a given period of time following sentence or parole. *See Id.; United States v. Mullis,* 1998 WL 957334, at *3 (W.D.Tenn.1998).

Congress, under § 921(a)(20), specifically allows for restoration of firearms privileges. Its clear that Congress never evinced a belief that a federal administrative agency was solely and specially capable of making the requisite determination. Instead, this Court concludes that Congress manifested exactly the opposite intent because it allowed states such wide latitude in restoring for state felons the same federal disability at issue here. It is

---

**5.** A state cannot, however, remove a federal felon's federal firearm disability. *See Beec-*

*ham,* 511 U.S. at 368, 114 S.Ct. 1669.

inconsistent with the totality of the statutory scheme to hold that Congress intended that a convicted individual would never have the right to prove himself worthy of restoration of firearms privileges.

■ It is this Court's opinion that Congress' failure to fund the review of applications by the ATF was not a complete suspension of *relief* under 18 U.S.C. § 925(c), but rather Congress only intended the suspension of the ATF's ability to investigate or act upon applications for relief by individuals.

## 2. The proper place of legislative history in this case.

■ There is plenty of conflicting legislative history regarding this issue. Ultimately, the Court recognizes that an advocate can find an abundance of legislative history to support his position. The Court believes that the prudent thing to do is to focus in on language of the statute. After reviewing the pages and pages of committee notes, senate reports, and "hearings before subcommittees of committees," [6] the Court reminded itself that statutory interpretation begins with the language of the statute itself. *Pennsylvania Dep't of Pub. Welfare v. Davenport,* 495 U.S. 552, 557–58, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990). And if the language of the statute is clear, "that is the end of the matter, and the court must give effect to [the] unambiguously expressed intent of Congress." *Norfolk & Western Railway Co. v. American Train Dispatchers' Ass'n,* 499 U.S. 117, 128, 111 S.Ct. 1156, 1163, 113 L.Ed.2d 95 (1991).

The fact of the matter is that 18 U.S.C. § 925(c) allows for relief from disabilities under the Federal Firearms Act. True, the ATF no longer has the funds in which to conduct their investigations. However, *the statute still provides for judicial review.* As one court has recently stated, "If Congress wants to preclude all applications by convicted felons, ... it should so state and

not attempt to achieve that result by means that are 'indirect' at best." *McHugh v. Rubin,* 49 F.Supp.2d 105, 110, (E.D.N.Y.1999).

It depends whose side you represent as to which committee report you choose to employ and which committee report you choose to ignore. And in reality, committee reports are not an authoritative interpretation of what the statute meant, nor an authoritative expression of what that Congress intended. *Pierce v. Underwood,* 487 U.S. 552, 567–68, 108 S.Ct. 2541, 2551–52, 101 L.Ed.2d 490 (1988). In this Court's opinion, the legislative history on the issue is far from "clear." If various district and appellate courts read the exact same legislative history and come to different conclusions (as the courts do on this issue), then it is this Court's opinion that the legislative history is far from "clear."

This is a textbook case on why the courts should be hesitant to use legislative history to suspend any substantive right which is expressly available in statutes. After reviewing all possible legislative history, this Court almost concurs with Justice Scalia when he stated that "it would be better ... to stop confusing the ... Court, and not to use committee reports at all." *Wisconsin Public Intervenor v. Mortier,* 501 U.S. 597, 621, 111 S.Ct. 2476, 2490, 115 L.Ed.2d 532 (1991) (Scalia, J., concurring). Legislative history does have its purpose, but we must remember that "[r]eliance on legislative history in divining the intent of Congress is ... a step to be taken cautiously." *Piper v. Chris–Craft Ind.,* 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977). After all, legislators legislate by legislating; not by talking in committee meetings.

## 3. Courts are suited to make the ultimate determination of the petitioner's application for relief.

The McGill Court is concerned that the judiciary is not a proper forum for deter-

---

**6.** For example, *see* Treasury, Postal Service, and General Government Appropriations for Fiscal Year 1993: Hearings on H.R. 5488

Before the Subcomm. of the Senate Comm. on Appropriations, 102d Cong. 69 (1993)

mining whether applicants "are likely [to] act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. § 925(c); *McGill*, 74 F.3d at 67.

On the contrary, this Court believes that courts are capable of deciding whether to grant or deny an individual's relief from disabilities request. As in the case now before this Court, the burden would be on the applicant to submit evidence that he would not act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest. This evidence would include such things as the applicant's record, reputation, and the underlying reason for the disability. In addition, the court could require the applicant to submit additional evidence before making its determination on whether to grant relief.

Moreover, allowing a court to grant the relief solves several concerns expressed by Congress and the circuit courts. First, it would shift the financial burden from the government to the applicant. As in this case, the applicant would be responsible for paying court costs and attorneys fees. Second, instead of the ATF conducting investigations on the applicant, the applicant would have to secure all the necessary evidence in order to receive relief. And, if the court deems more evidence is needed, it will be up to the applicant to secure such evidence. Third, a court is a better-suited forum for deciding these issues because it is adjudicative in nature. In addition, if the court needs to know how the ATF had conducted its investigations in the past, this information is available in the Code of Federal Regulations and case law. *See* 27 C.F.R. § 178.144; *Smith v. Brady*, 813 F.Supp. 1382, 1383–84 (E.D.Wis.1993) (describing ATF's investigative procedures). Courts can decide relief questions without the need of ATF expertise, and if investigative work needs to be done, the applicant himself would have to conduct it. *See* Ronald C. Griffin, *Obtaining Relief from Federal Firearms Disabilities: Did Congress Really Suspend the Relief Available to Felons Through Appropriations Acts?*, 23 Okla. City U.L.Rev. 977 (1998)

This Court recognizes the importance of making the correct decision on the applicant's request for relief under the Federal Firearm's Act. However, part of the day-to-day role of the court is to make character determinations of the individuals before it. The judiciary is adjudicative in nature and is capable of handling this sensitive matter.

**B. Inaction by the ATF constitutes a defacto denial of an application such that a United States district court may consider a petition for judicial review of the denial.**

18 U.S.C. § 925(c) states that "[a]ny person whose application for relief from disabilities is denied by the Secretary may file a petition with the United States district court ... for a judicial review of such denial." The Government in this case argues that since the ATF has not expressly "denied" Mr. Bean's petition for relief, this Court does not have jurisdiction to hear the matter.

The general rule concerning exhaustion is " 'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.' " *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969) (quoting Myers, 303 U.S. at 50–51, 58 S.Ct. at 463); *see also McCarthy*, 503 U.S. at 144–45, 112 S.Ct. at 1085–86 ("This Court long has acknowledged the general rule that parties exhaust prescribed administrative remedies before seeking relief from the federal courts.") (citing *Myers*, 303 U.S. at 50–51 and n. 9, 58 S.Ct. at 463 and n. 9). "Exhaustion is required because it serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *McCarthy*, 503 U.S. at 145, 112 S.Ct. at 1086.

However, this Court holds that exhaustion of administrative remedies in this

case is excused. Exhaustion of administrative remedies which would be wholly futile or inadequate due to lack of appropriations waives Petitioner's obligation to exhaust such administrative remedies. *See McCarthy v. Madigan*, 503 U.S. 140, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992). It seems clear to this Court that Congress did not intend to apply rigidly the doctrine of exhaustion of administrative remedies in this context because it gave the district courts discretion to create or supplement the administrative record when necessary to avoid a miscarriage of justice. *See* 18 U.S.C. § 925(c); *Rice v. United States*, 68 F.3d 702, 709 (3d Cir.1995). In sum, "Plaintiffs cannot be expected to exhaust their administrative remedies when there are no administrative remedies for them to exhaust." *Chan v. Reno*, 932 F.Supp. 535, 540 (S.D.N.Y.1996). Accordingly, this Court holds that inaction by the ATF constitutes a defacto denial of an application such that a United States district court may consider a petition for judicial review of the denial.

**C. A foreign conviction cannot, as a defacto rule, serve as the predicate offense for a prohibition of firearms privileges under 18 U.S.C. § 922(g)(1).**

18 U.S.C. § 922(g)(1) makes it unlawful for a person who has been convicted in "any court" of a crime punishable by imprisonment for a term exceeding one year to possess a firearm. Both the Fourth Circuit, *United States v. Atkins*, 872 F.2d 94 (4th Cir.1989), and the Sixth Circuit, *United States v. Winson*, 793 F.2d 754 (6th Cir.1986), have addressed this issue and concluded that the a defendant may be restricted from possessing a firearm based on his having been convicted of offenses in courts outside the United States.

■ In particular, the Sixth Circuit supported its decision by stating that "[s]ince the object of the statute is to prevent the possession of firearms by individuals with serious criminal records [citations omitted], we can perceive no reason why the commission of serious crimes elsewhere in the world is likely to make the person so convicted less dangerous than he whose crimes were committed within the United States." *Winson*, at 793 F.2d at 758. The dangerous flaw with this reasoning is that a "serious" crime in one country is not necessarily considered "serious" in the United States.

The circumstances of Mr. Bean's conviction are disturbing to this Court. Mexican law requires an accused person to furnish a statement regarding the crime charged, even if the statement is incriminating. The arrested person can be charged with a separate offense should the arrested person fail to make such statement.

Knowing that Mr. Bean could not read, speak, or understand the Spanish language, the Mexican officials prepared a statement for Mr. Bean to sign. Bean was then instructed to sign the documents prepared in Spanish without the benefit of an interpreter who could explain to Mr. Bean what the documents stated or represented.[7] Mr. Bean came to find out later that the documents which he signed amounted to a confession. Pursuant to the signed confession, Mr. Bean was ultimately convicted and sentenced to a term of imprisonment of five years in Mexico for the "Introduction of Ammunition into the Republic of Mexico."

This Court believes that the punishment imposed on Mr. Bean in Mexico was far too severe, especially in light of how the Mexican officials handled his arrest, trial, and conviction. Mr. Bean was carrying a

7. The record is not clear as to whether Mr. Bean had counsel during the crucial time periods throughout his arrest, trial, conviction, and subsequent imprisonment in Mexico. Mr. Bean stated that he did not have an attorney for much of his stay in Mexico. However, there is also evidence to suggest that he knowingly and voluntarily waived his right to an attorney and hired a Mexican C.P.A. to help him in his quest to return to the United States.

box of ammunition. This is hardly a crime "serious" enough to take away an individual's right to possess a firearm. The Court recognizes the right of Mexico to legislate its own laws within its own borders. However, even Mexican lawmakers have realized that the penalty does not fit the crime. After Mr. Bean's case was made public through the media, the Republic of Mexico relaxed the criminal statute in question to make the offense of introducing firearms or ammunition across its border a misdemeanor offense with only a fine on the first occasion.

This case is a perfect illustration as to why the phrase "any court" in 18 U.S.C. § 922(g)(1) cannot be interpreted to mean "any court in the world regardless of the severity of the crime or the due process which the defendant was entitled during the defense of his case." [8]

**8.** *See* Martha Kimes, *The Effect of Foreign Criminal Convictions Under American Repeat Offender Statutes: A Case Against the Use of Foreign Crimes in Determining Habitual Criminal Status*, 35 Colum.J. Transnat'l L. 503, 518–21 (1997).

The above Note focuses on the use of foreign crimes in determining habitual criminal status. However, the same arguments apply with respect to using foreign convictions as a predicate offense for a prohibition of firearms under 18 U.S.C. § 922(g)(1). This Note states as follows:

"In practice, the use of foreign convictions ... contravenes the principle that defendants should be treated equally. Because some countries display a much more punitive policy than others by criminalizing more behaviors and prosecuting violations of the law more aggressively, the use of foreign convictions ... invites arbitrary distinctions in punishment simply based on whether a defendant happens to have committed a prior crime in a country with strict, rather than lenient, policies. Despite the same actual conduct, different defendants could be prosecuted for very different 'crimes' (or not prosecuted at all) depending solely on the punitive attitude of the country in which the conduct was committed; defendants who have committed the same acts in the past, then, will start off on very different and arbitrarily unequal footings in subsequent United States proceedings that seek to take into account prior foreign convictions."

**D. This Court has determined that Mr. Bean will not be "likely to act in a manner dangerous to public safety" and the "granting of the relief would not be contrary to the public interest." 18 U.S.C. § 925(c).**

■ Mr. Bean is a resident of Orange County, Texas, in the Eastern District of Texas. He is sixty years of age, has been married to his wife since 1962, and has two adult children. Before his conviction in Mexico, Mr. Bean was a licensed firearms dealer. He has also worked as a car dealer in Port Arthur, Texas for several years.

The Court starts the analysis as to Mr. Bean's character by taking notice that Mr. Bean has never been charged with or convicted of a crime in the United States, except for minor traffic offenses. He has also submitted the following evidence to support that he would not be a danger to

"It is within each country's power to determine what punishment to prescribe for crimes committed within its borders, but the fact that different countries do decide to prosecute very different crimes and impose very different punishments compounds the difficulty of using foreign convictions.... Add to this the fact that prior criminal convictions from certain countries are necessarily easier for prosecutors to discover than others, and it is clear that the use of foreign convictions will penalize defendants with convictions from some countries much more strictly than others."

"Furthermore, procedural due process concerns are automatically raised with the use of foreign criminal convictions. The American concept of due process is one that has slowly developed and evolved over many years, ultimately providing a large body of procedural safeguards that work together to guarantee an acceptable level of fairness in criminal trials. The whole system of due process protections that the American system provides amounts to more than just the sum of the individual procedural safeguards of which it is made. Although other countries have due process clauses in their constitutions and many countries provide criminal defendants with most of the same safeguards that the United States provides, no other system truly matches the rules that have been deemed necessary in the United States to protect both individual fairness and reliability of convictions...."

public safety if he were allowed to possess a firearm:

1. During the hearing of January 20, 2000, Carl Fronabarger, an inspector for the Bureau of Alcohol, Tobacco and Firearms, testified that he was responsible for checking Petitioner's firearms records as a licensed dealer and found Petitioner to be a cooperative licensee and to maintain excellent records.

2. During the hearing of January 20, 2000, M.E. "Duke" Gorris, Chief of Police of Port Arthur, Jefferson County, Texas, testified that he personally knows Petitioner and confirmed Petitioner's reputation for being a law abiding citizen of the community and a cautious licensed firearms dealer when Petitioner held his license.

3. During the hearing of January 20, 2000, Lionel Herrera, a deputy sheriff from near Laredo, Texas, confirmed Petitioner's trustworthiness and good character.

4. During the hearing of January 20, 2000, Joe Bob Kinsel, Jr., a well-known and respected businessman and business competitor of Petitioner testified that he has known Petitioner for approximately 20 years and confirmed Petitioner's good personal and business reputation and credible character.

5. During the hearing of January 20, 2000, John Neil, a local businessman and friend of Petitioner's who has hunted with Petitioner in the past, testified that Petitioner was a safe handler of firearms.

6. During the hearing of January 20, 2000, several letters of recommendation were admitted into evidence. *See* Exhibit 6. The letters were written by the following individuals: (1) James L. Reynolds, Chief of Police, Vidor Texas; (2) Mike White, Sheriff of Orange County Sheriff's Department; (3) M.E. Gorris, Chief of Police, Port Arthur, Texas; (4) Stephen B. Savoy, City Marshal, Groves Police Department; (5) Buddie Hahn, State District Judge, 260th Judicial District, Orange County, TX; (6) Paul M. Fukuda, Assistant District Attorney, Orange County, Texas; (7) Dr. Carl J. Beaudry, Petitioner's Orthopedic Surgeon, Port Arthur, Texas; (8) Thurman Bobo, President of the Young Men's Business League, Beaumont, Texas; (9) Joe E. Polk, President and Chairman of the Board of Buddy Chevrolet, Inc., Port Arthur, Texas; and (10) Mark E. Viator, Pastor of the Friendship Baptist Church, Beaumont, Texas. All of these letters refer generally to the Petitioner's good moral character, integrity, and reputation.

Mr. Bean has satisfied his burden to this Court in establishing that he "will not be likely to act in a manner dangerous to public safety" and that "the granting of relief will not be contrary to the public interest." 18 U.S.C. § 925(c).

### CONCLUSION

For the reasons discussed above, Mr. Bean's "Petition for Relief from Disabilities Under the Federal Firearms Act" is to be GRANTED. A separate Order will be entered in accordance with this Opinion.

### ORDER

On the 20th day of January, 2000, came on to be heard the Petition for Relief from Disabilities Under Federal Firearms Act filed in the above entitled and numbered cause of action by Petitioner, THOMAS LAMAR BEAN, who appeared in person and by and through his attorney of record.

Respondents, UNITED STATES OF AMERICA, BUREAU OF ALCOHOL, TOBACCO AND FIREARMS, appeared by and through Mr. Paul Naman, Assistant United States Attorney.

The Court having considered the pleadings, evidence and argument of counsel,

finds that the circumstances regarding the disability imposed by law and Petitioner's record and reputation are such that Petitioner will not be likely to act in a manner dangerous to public safety and that the granting of the relief requested would not be contrary to the public interest, and that said petition should be granted.

In accordance with the Memorandum Opinion entered on this date, it is therefore ORDERED, ADJUDGED AND DECREED in accordance with 18 U.S.C. § 925(c) that Petitioner, THOMAS LAMAR BEAN, is hereby GRANTED relief from all disabilities imposed by Federal laws with respect to Petitioner's acquisition, receipt, transfer, shipment, transportation, or possession of firearms resulting from his foreign conviction on May 27, 1998, in Nuevo Laredo, Tamaulipas, Republic of Mexico: